# Exhibit 1

Canton Facility
2020 AOC



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

**MAR 1 1 2020**

REPLY TO THE ATTENTION OF

ECW-15J

<u>CERTIFIED MAIL</u> 7018 1130 0002 1944 3587
<u>RETURN RECEIPT REQUESTED</u>

Mr. John Wilkinson
Republic Steel
2633 Eighth Street, NE
Canton, OH 44704

Subject:    Administrative Order on Consent Under the Clean Water Act

Dear Mr. Wilkinson:

Enclosed please find the fully-executed Administrative Order on Consent (AOC) for compliance with the Clean Water Act (CWA) and the National Pollutant Discharge Elimination System (NPDES) permit (OH0006912) issued to the Republic Steel Canton Hot Roll Plant. The effective date of the AOC is the date the AOC was signed by EPA. Please note that the AOC sets out measures to correct the alleged violations and bring the facility into compliance with the CWA and the facility's NPDES permit. The facility remains responsible for implementing all such compliance measures. As stated in the AOC, neither issuance of the AOC nor compliance with its terms precludes further enforcement action by EPA, including an action for penalties, under the CWA.

Thank you for your efforts to bring your facility into compliance with the CWA. If you have any questions or concerns, please contact Dean Maraldo of my staff at (312) 353-2098 or maraldo.dean@epa.gov, or your legal counsel may contact Jeffrey Cahn, Associate Regional Counsel, at (312) 886-6670 or cahn.jeff@epa.gov.

Sincerely,

Michael D. Harris

Michael D. Harris
Division Director
Enforcement and Compliance Assurance Division

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 5

| | |
|---|---|
| In the Matter of: | ) |
| | ) **Administrative Order on Consent** |
| Republic Steel, | ) **Under Section 309(a) of the Clean Water** |
| | ) **Act, 33 U.S.C. § 1319(a)** |
| Respondent. | ) |
| | ) |
| | ) |

## I. INTRODUCTION

1. The U.S. Environmental Protection Agency ("EPA") makes the findings of fact set forth below (Section IV) and is issuing this Administrative Order on Consent ("Order on Consent" or "Order") to Republic Steel, owner of the Republic Steel Canton Hot Roll Plant, ("Respondent") under the authority of Section 309(a) of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1319(a). The Administrator of EPA has delegated the authority to issue such orders to the Regional Administrator of EPA Region 5, who has redelegated this authority to the Director of the Enforcement and Compliance Assurance Division, EPA, Region 5.

2. EPA and Respondent voluntarily enter into this Order.

3. In accordance with section 309(a)(4) of the CWA, 33 U.S.C. §1319(a)(4), EPA will provide notice and a copy of this Order on Consent to the Ohio Environmental Protection Agency ("Ohio EPA") upon execution.

4. At all times relevant to this Order, Respondent has owned and operated the Republic Steel Canton Hot Roll Plant, located at 2633 Eighth Street N.E., Canton, Ohio (the "Facility").

5. EPA alleges that Respondent failed to comply with National Pollutant Discharge Elimination System ("NPDES") Permit No. OH0006912 at the Republic Steel Canton Hot Roll Plant, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). EPA alleges that Respondent violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging a pollutant or pollutants into the navigable waters from a point source without a permit to do so.

6. By entering into this Order, Respondent: (1) consents to EPA's authority to issue this Order; (2) neither admits nor denies the factual allegations or conclusions of law as set forth in this Order; (3) does not admit guilt or liability or waived any defenses to the allegations made herein; (4) agrees to undertake all actions required by the terms and conditions of this Order; and (5) agrees not to contest the authority of EPA to issue this Order or the validity of any terms or conditions in this Order.

1

Republic Steel Canton Hot Roll Plant

7. For the purposes of this Order only, Respondent waives any and all remedies, claims for relief, and otherwise available rights to judicial or administrative review that Respondent may have with respect to any issue of fact or law set forth in this Order on Consent, including, but not limited to, any right of judicial review under Chapter 7 of the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## II. STATUTORY AUTHORITY

8. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person except, *inter alia*, in compliance with an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

9. Section 402 of the CWA, 33 U.S.C. § 1342, authorizes states to request approval from EPA to administer their own permit programs for discharges into navigable waters within their jurisdictions.

10. Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the State of Ohio requested approval from EPA to administer its own permit program for discharges into navigable waters within Ohio, and such approval was granted by EPA on March 11, 1974, 39 Fed. Reg. 26,061 (July 16, 1974). Therefore, pursuant to the State's permit program, the Ohio EPA has issued Ohio EPA NPDES permits. Violation of an NPDES permit is a violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

11. Section 309(a)(3) of the CWA, 33 U.S.C. § 1319(a)(3), provides that whenever EPA finds that any person is in violation of requirements of, *inter alia*, Sections 301, 308, or 402 of the CWA, 33 U.S.C. § 1311, 1318, 1342, or is in violation of any condition or limitation that implements those sections in an NPDES permit, EPA shall issue an order requiring such person to comply with such requirements, conditions, or limitations. Section 309(a)(5) of the CWA, 33 U.S.C. § 1319(a)(5), requires that any such order shall specify a time for compliance that EPA determines to be reasonable taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements.

## III. DEFINITIONS

12. All terms used, but not defined, in this Order have the meanings provided to them in the CWA, 33 U.S.C. § 1251 *et seq.*, and the effective EPA regulations promulgated under the CWA.

13. "Act" or "CWA" means the Clean Water Act, 33 U.S.C. § 1251 *et seq.*

14. "Day" or "days" means a calendar day or calendar days unless expressly stated to be a business day. When computing any period of time under this Order, should the last day fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

2

15. "Discharge of a pollutant," as defined in Section 502(12) of the CWA, means *inter alia*, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

16. "Effective Date" has the definition provided in Section IX of this Order.

17. "EPA" means the United States Environmental Protection Agency.

18. "Facility" means the Republic Steel Canton Hot Roll Plant located at 2633 Eighth Street N.E., Canton, Ohio.

19. "MGD" means millions of gallons per day.

20. "Navigable waters," as defined in Section 502(7) of the CWA, means "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

21. "NPDES Permit" and "Permit" mean the permit issued in accordance with the National Pollutant Discharge Elimination System (NPDES) pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. In this Order, these terms mean NPDES Permit No. OH0006912, issued by the State of Ohio to Respondent for the Republic Steel Canton Hot Roll Plant with the effective date of August 1, 2016, and the expiration date of July 31, 2021. For purposes of Sections IV through X of this Order, "Permit" also means any subsequent NPDES permit issued by the State of Ohio to Respondent for the Republic Steel Canton Hot Roll Plant, until such time as this Order is terminated.

22. "Order on Consent" and "Order" means this document, all attachments hereto, and all subsequent modifications thereto, including incorporated submissions from Respondent, as described in paragraph 67.

23. "Outfall" means a type of "point source," as that term is defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14), that serves as a discharge point from the facility. "Outfall" followed by an Arabic numeral means that Outfall assigned that number in Respondent's NPDES permit.

24. "Paragraph" means a portion of this Order identified by an Arabic numeral.

25. "Parties" means the EPA and Respondent/Facility.

26. "Person," as defined in Section 502(5) of the CWA, means an "individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

3

Republic Steel Canton Hot Roll Plant

27. "Point source," as defined in Section 502(14) of the CWA, means "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

28. "Pollutant," as defined in Section 502(6) of the CWA, means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

29. "Respondent" means Republic Steel, the owner of the Republic Steel Canton Hot Roll Plant.

30. "State" means the State of Ohio.

31. "Ohio EPA" means the Ohio Environmental Protection Agency and any successor departments, agencies, or instrumentalities of the State.

32. The regulation at 40 C.F.R. § 122.2 (1993, 2015, and 2019)[1] defines the term "waters of the United States."

33. "Work" means any and all activities Respondent is required to undertake and accomplish to achieve compliance under this Order.

## IV.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

34. Respondent is a corporation, so it is a "person," as defined in Section 502(5) of the CWA, 33 U.S.C. § 1362(5), and 40 C.F.R. § 122.2.

35. At all times relevant to this Order, Respondent owned and operated the Republic Steel Canton Hot Roll Plant, a hot rolled bar and coil steel melt facility, located in Canton, Ohio.

36. At all times relevant to this Order, Outfall No. 010 discharged effluent from internal Outfall No. 601, noncontact cooling water, service water, freeze protection water, steam condensate, storm water, and groundwater. Pollutants discharged from Outfall No. 010 and into the East Branch of Nimishillen Creek include: oil and grease; nitrogen, ammonia; phosphorus; selenium; barium; zinc; lead; copper; residual chlorine; total suspended solids; and mercury.

37. At all times relevant to this Order, Outfalls No. 003, 006, 008, 009, 010, 011, 020, 022, and 034 discharged storm water into the East Branch of Nimishillen Creek. Pollutants discharged from these outfalls and into the East Branch of Nimishillen Creek include: phosphorus; barium; chromium; copper; iron; aluminum; lead; zinc; oil and grease; chlorine; and total suspended solids.

---

1. 58 Fed. Reg. 45,038 (Aug. 25, 1993); 80 Fed. Reg. 37,114 (June 29, 2015); and 84 Fed. Reg. 56,669 (Oct. 22, 2019).

4

Republic Steel Canton Hot Roll Plant

38. At all times relevant to this Order, Outfalls No. 027, 028, 029, 030, 031, 032, and 033 discharged storm water into Harding Creek, a tributary of the East Branch of Nimishillen Creek. Pollutants discharged from these outfalls and into Harding Creek include: zinc; lead; copper; and total suspended solids.

39. Outfalls No. 003, 006, 008, 009, 010, 011, 020, 022, 027, 028, 029, 030, 031, 032, 033, 034, and 601 at the Republic Steel Canton Hot Roll Plant are "point sources," as defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

40. Oil and grease; nitrogen, ammonia; phosphorus; selenium; barium; chromium; iron; aluminum; zinc; lead; copper; chlorine; total suspended solids; and mercury are "pollutants," as defined in Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

41. Each of the discharges described in paragraphs 36, 37, and 38 are a "discharge of a pollutant," as defined in Section 502(12) of the CWA, 33 U.S.C. § 1362(12).

42. East Branch of Nimishillen Creek is a river and "navigable water" within the meaning of Section 502 of the CWA, 33 U.S.C. § 1362, and "waters of the United States" within the meaning of 40 C.F.R. § 122.2 (1993, 2015, and 2019).

43. At all times relevant to this Order, the outfall(s) at the Facility acted as point sources of "discharges" of "pollutants" with its final wastewater and storm water discharge to the East Branch of Nimishillen Creek, and Harding Creek, a tributary of the East Branch of Nimishillen Creek.

44. Because Respondent owned or operated the Facility with outfalls that acted as point sources for the discharge of pollutants to navigable waters, Respondent and the Facility have been subject to the CWA at all times relevant to this Order. Thus, any such discharge has been and is subject to the specific terms and conditions prescribed in the applicable permit and the CWA.

45. Respondent applied for and was issued an NPDES Permit No. OH0006912 ("Permit") under Section 402 of the CWA, 33 U.S.C. § 1342, which became effective on August 1, 2016. At all times relevant to this Order, Respondent was authorized to discharge pollutants from the Facility to navigable waters only in compliance with the specific terms and conditions of the Permit.

46. The Permit includes "Final Effluent Limitations and Monitoring Requirements" that require Respondent to sample and test its effluent and monitor its compliance with Permit conditions and applicable regulations, according to specific procedures, and places certain limitations on the quality and quantity of effluent discharged by Respondent. The Permit also requires Respondent to file certified Discharge Monitoring Reports ("DMRs") of the results of monitoring and Noncompliance Reports with Ohio EPA as appropriate. The relevant

5

Republic Steel Canton Hot Roll Plant

discharge limitations are specified in the Permit Part I.A., which is incorporated herein by reference.

47. Permittees must monitor discharges and report results in their DMRs, as required by their permits.

48. Certified DMRs filed by Respondent with Ohio EPA, as required by the Permit, show discharges of pollutants from the facility that exceed the permitted effluent limitations established in the Permit, as specified in Permit Part I.A., which is incorporated herein by reference, and summarized in Attachment A.

49. Respondent is a person who discharged pollutants from point sources into navigable waters, in violation of its Permit. Accordingly, each instance in which Respondent discharged pollutants to navigable waters in amounts exceeding the effluent limitations contained in the Permit is a violation of the Permit and Section 301 of the CWA, 33 U.S.C. § 1311.

50. On August 27, 2019, EPA conducted an inspection at the Facility to assess the Respondent's compliance with its Permit. The inspection identified deficiencies related to self-monitoring, reporting, notification, permit compliance schedules, and the operation and maintenance ("O&M") of the Facility. From a visual inspection of the Facility and review of DMRs and other records, EPA made the following observations:

   (a) Respondent provided a process flow diagram showing that the former 35" mill scale pit receives storm water, ground water, and air compressor non-contact cooling water ("NCCW"). During the inspection, Facility representatives said the scale pit received NCCW from transformers. The scale pit has a skimmer, but it is not used. During the inspection, EPA inspectors observed a slug of rust-colored oil flowing into the scale pit. Facility representatives could not explain what the source of the oil may have been;
   (b) Electric arc furnace slag is cooled with water in an unpaved area south of the No. 4 Melt Shop area. According to a Facility representative, this is done for dust control. During the inspection, EPA inspectors observed contact cooling water flowing into a nearby storm sewer inlet. The Facility representatives did not know where the sewer line ultimately discharged. Ohio EPA was unaware of the discharge. Part III of the Permit requires that any process modifications, which will result in new, different, or increased discharges of pollutant must be reported to Ohio EPA as soon as practicable;
   (c) Parts I.A.5 and I.A.9 of the Permit require daily 24-hour flow monitoring at Internal Monitoring Station 601 and Final Outfall 010. Respondent appears to record 24-hour flow once a week; identical flows are reported for six consecutive days and a measured and/or estimated flow is reported on the seventh day. The reported flow for the six-day period appears to be an average flow over that period;
   (d) The primary flow device for measuring flow at Internal Monitoring Station 601 is a 90° V-notch weir. The discharge head is measured with an ISCO 4230 Bubble Flow Meter. The ISCO 4230 is programmed to display flow rate in gallons per minute and totalized flow in million gallons per day. During the inspection of the weir, EPA inspectors

Republic Steel Canton Hot Roll Plant

observed two surges of wastewater that exceeded the height of the V-notch and flowed over the bulkhead. Every instance of wastewater above the height of the notch results in underreported flow (Permit Part I.A.9);

(e) Part I.A.5 of the Permit requires daily 24-hour flow monitoring at Outfall 010. The primary flow device for measuring flow at Outfall 010 is a Palmer-Bowlus flume. The shed that houses the flow meter was locked, so the flow meter could not be inspected. In a September 9, 2019, email from a Facility representative, Respondent stated that the flow meter "had not operated for about 2 months due to a short circuit in the power feed to the unit.";

(f) Parts I.A.5 and I.A.9 of the Permit require daily 24-hour flow monitoring at Internal Monitoring Station 601 and Final Outfall 010. Outfall 010 consists of wastewater from Internal Monitoring Station 601, service water bleeds, freeze protection lines, steam condensate, storm water, and groundwater. Respondent reported daily flows during July 2019 at Internal Monitoring Station 601 ranging from 0.47 - 0.94 MGD in their DMR submittal. Respondent reported no flow every day of July 2019 for Outfall 010. From June 25 to June 31, 2019, flows at Internal Monitoring Station 601 were estimated at 0.68 - 0.86 MGD. Flows at Outfall 010 were reported to be 0 MGD;

(g) Pursuant to Parts I.A.5 and I.A.9 of the Permit, 24-hour composite samples, for Internal Monitoring Station 601 and Outfall 010, shall be flow-weighted composite samples. According to Facility representatives, the composite samples collected at Internal Monitoring Station 601 and Outfall 010 are time-weighted composite samples;

(h) Pursuant to Part III.3.A of the Permit, at all times, the Respondent shall maintain in good working order and operate as efficiently as possible all treatment or control facilities or systems installed or used by the permittee necessary to achieve compliance with the terms and conditions of the Permit. During inspection of the WQCC west clarifier, EPA inspectors observed an oil sheen on the surface of the water; and observed vegetation growing in the clarifier launder trough, short-circuiting flow through some of the weir notches;

(i) Part I.C.1.c of the Permit states that not later than 24 months from the effective date of the permit (i.e., August 1, 2018), the permittee shall achieve the final effluent limitations at Outfall 3ID00000010 (Outfall 010). Based on EPA's review of Facility DMRs submitted by the Respondent, the permittee did not achieve the final effluent limitations at Outfall 010 for total residual chlorine, mercury or selenium by that date;

(j) Part II.I of the Permit requires Respondent to report in writing to Ohio EPA Northeast District Office within 30 days after any effluent copper concentration at Outfall 003 that is greater than the preliminary effluent limit (54 ug/L as a maximum or 32 ug/L as an average). On July 18, 2017, Respondent notified Ohio EPA that the copper level exceeded the 30-day average value two of six months from January to June 2017. The cause was attributed to large amounts of snow and/or rain runoff. EPA inspectors reviewed more recent discharge monitoring data and noted that the 30-day average copper concentration at Outfall 003 was greater than the 32 ug/L for six of six months from June through November 2017. Respondent only reported results for June and August. The 30-day average copper concentration at Outfall 003 was also greater than 32 ug/L for six of six months from December 2018 through May 2019. Respondent only

7

reported results for December 2018 and March 2019; and

(k) EPA inspectors reviewed the Storm Water Pollution Prevention Plan ("SWPPP") provided by the Respondent during the inspection and identified missing or deficient components required pursuant to Permit Part IV. Specific missing or deficient SWPPP components are summarized in Attachment B to this Order.

These deficiencies are described in more detail in the EPA Region 5, *NPDES Compliance Evaluation Inspection Report* for the Facility, dated October 31, 2019, which has been provided to the Respondent.

51. On September 25-26, 2019, Ohio EPA conducted a storm water inspection at the Facility to assess the Respondent's compliance with its Permit. An EPA inspector also attended the inspection. The inspection identified SWPPP deficiencies and areas of concern related to maintenance of best management practices ("BMPs"), housekeeping, spill management and response, unauthorized non-storm water discharges, and other discharges of unknown origin. These deficiencies are described in more detail in the *Ohio Environmental Protection Agency NPDES Inspection Report* for the Facility, dated November 6, 2019, which has been provided to the Respondent (see Ohio EPA Storm Water Finding Summary in Attachment C of this Order).

52. During all times relevant to this Order, Respondent did not apply for, and was not issued, an NPDES Permit under Section 402 of the CWA, 33 U.S.C. § 1342, authorizing the discharge of pollutants from wastewater generated from contact cooling of hot slag from the No. 4 Melt Shop area. As discussed in Paragraph 50(b), on August 27, 2019 and September 26, 2019, EPA inspectors observed the contact cooling (water spraying) of hot slag in the No. 4 Melt Shop area and the resulting discharge of the contact cooling wastewater to a storm water catch basin.

53. Respondent is a person who discharged pollutants from a point source into navigable waters, without a permit authorizing such discharges under Section 402 of the CWA, 33 U.S.C. § 1342. Accordingly, the instances described in paragraph 52, in which Respondent discharged pollutants to navigable waters without a permit authorizing such discharges, are violations of Section 301 of the CWA, 33 U.S.C. § 1311.

## V. ORDER ON CONSENT

54. Based on the foregoing findings and the authority vested in the undersigned Director, Enforcement and Compliance Assurance Division, it is hereby ordered and agreed to in accordance with Section 309(a) of the CWA, 33 U.S.C. § 1319(a), that Respondent comply with the following actions:

(a) Unauthorized discharges: Within 30 days after the effective date of this Order, Respondent must eliminate all known unauthorized discharges, including the discharges described in Paragraphs 50(b) and 52 of this Order, and submit a report to EPA

8

Republic Steel Canton Hot Roll Plant

documenting actions taken to eliminate the unauthorized discharges. If any unauthorized discharges cannot be eliminated within 30 days after the effective date of this Order, then Respondent must submit a plan, for EPA review and approval within 30 days after the effective date of this Order, describing the specific actions to be taken to eliminate the unauthorized discharges within a certain timeframe.

(b) Effluent limit violations: Within 90 days after the effective date of this Order, Respondent must submit a plan describing the specific actions to be taken to correct the total residual chlorine and selenium effluent limitation violations summarized in Attachment A to this Order, and copper effluent limit exceedances at stormwater Outfall 003. The plan must include schedules and estimated costs to complete all work necessary to correct the violations in accordance with the following:

   (1) Total residual chlorine (Outfall No.010): The plan must include a schedule to complete all work necessary to correct the total residual chlorine violations and achieve compliance with final permit effluent limits within 180 days after the effective date of this Order;

   (2) Selenium (Outfall No. 010): The plan must include a schedule to complete all work necessary to correct the total recoverable selenium violations and achieve compliance with final permit effluent limits within 180 days after the effective date of this Order; and

   (3) Copper (Outfall No. 003): The plan must include a schedule to complete all work necessary to correct the copper violations and achieve compliance with final permit effluent limits within 120 days after the effective date of this Order.

(c) Dry Weather Stormwater Outfall Monitoring

   (1) Within 90 days after the effective date of this Order, Respondent shall conduct monitoring as set forth below for the stormwater outfalls identified below flowing during periods of dry weather, and shall submit a Dry Weather Stormwater Outfall Monitoring Report to EPA, which contains the following information:

      i. Information showing the estimated flow for each monitored outfall, in gallons per minute, at time of sample collection;

      ii. Collect one grab sample from Outfalls 003, 006, 008, 009, 011, 020, 022, 024, 025, 027, 028, 029, 030, 031, 032, 033, and 034;

      iii. Results of dry weather outfall sampling and analysis identifying the nature and concentration of pollutants in the discharge from each outfall. Sampling shall consist of a representative sample taken from each outfall discharging during a period of dry weather (no measurable storm event within 72 hours prior to sampling). All grab samples shall be analyzed for the parameters listed in following table:

9

Republic Steel Canton Hot Roll Plant

| Dry Weather Outfall Monitoring - Sampling and Analysis Requirements |
|---|
| Parameter* |
| 00011 - Water Temperature - F |
| 00400 - pH - S.U. |
| 00552 - Oil and Grease, Hexane Extr Method - mg/l |
| 00610 - Nitrogen, Ammonia (NH3) - mg/l |
| 00665 - Phosphorus, Total (P) - mg/l |
| 00981 - Selenium, Total Recoverable - ug/l |
| 01009 - Barium, Total Recoverable - ug/l |
| 01094 - Zinc, Total Recoverable - ug/l |
| 01114 - Lead, Total Recoverable - ug/l |
| 01119 - Copper, Total Recoverable - ug/l |
| 50060 - Chlorine, Total Residual - mg/l |
| 50092 - Mercury, Total (Low Level) - ng/l |
| 00530 - Total Suspended Solids - mg/l |
| *Test procedures for the analysis of pollutants shall conform to regulation 40 CFR 136, "Test Procedures For The Analysis of Pollutants" unless other test procedures have been specified in NPDES permit OH0006912. |

      iv.    The Dry Weather Stormwater Outfall Monitoring Report shall indicate the time, date, and place of sampling, and methods of analysis, and shall certify that such sampling and analysis is representative of normal work cycles and expected pollutant discharges to each outfall. The report shall also document any permit effluent limit exceedances and unauthorized discharges identified as a result of the Dry Weather Stormwater Outfall Monitoring effort;

    (2)  Compliance Plan. Within 30 days after the submission of the Dry Weather Stormwater Outfall Monitoring Report, Respondent shall submit a written Compliance Plan to EPA for review and approval for 1) addressing all permit effluent limit exceedances within a certain timeframe; and 2) eliminating any unauthorized discharges within a certain timeframe. The Compliance Plan shall also include a detailed description of sources (e.g., storm water, groundwater, wastewater, etc.) for each monitored stormwater outfall.

(d) Storm Water Corrective Action Plan

    (1)  Within 120 days after the Effective Date, Respondent shall update its SWPPP and submit it to EPA. The updated plan shall include all areas at the Facility with storm water runoff from industrial materials and industrial processes, all monitoring and inspection requirements, and all control measures required by the Permit;

10

    (2) Within 60 days after the Effective Date, Respondent shall submit to EPA for review and approval a storm water corrective action plan that addresses all deficiencies identified in Attachment B and Attachment C of this Order (except for those items which will be addressing as part of paragraph 54(a) as indicated on Attachment C). The plan must include a detailed schedule to address each deficiency;

    (3) Within 30 days after the submission of the Dry Weather Stormwater Outfall Monitoring Report, Respondent shall update its SWPPP and submit it to EPA. The SWPPP must include updates to the site map required by Part IV.J.2.a.iii of the facility's Permit, and incorporate any new information obtained as a result of the Dry Weather Stormwater Outfall Monitoring program and Respondent's review of facility plans.

(e) Monitoring and O&M Corrective Action Plan:  Within 60 days after the Effective Date, Respondent shall submit to EPA for review and approval a monitoring and O&M corrective action plan that addresses all deficiencies identified in Paragraph 50 (c-h) of this Order.  The plan must include a detailed schedule to address each deficiency.

## VI. DOCUMENTATION AND SUBMISSIONS

55. Respondent must submit a status report to EPA within 30 days after the end of each calendar-year quarter (i.e., by January 31, April 30, July 31, and October 31), until this Order is terminated. The first status report will be due within 30 days after completion of the first _full_ quarter after the effective date of this Order. Each status report must include: (a) a description of the actions that have been taken toward achieving compliance with this Order during the previous quarter; (b) with regard to actions taken in response to paragraph 54(b), an assessment of the effectiveness of such actions in preventing effluent violations; (c) a summary of all effluent violations that occurred during the previous quarter; (d) an analysis of the cause of each such effluent violation; and (e) an assessment of whether compliance plan milestone dates due during the quarter were met, and, if not, the dates when the milestones will be met and the steps the Respondent is taking to ensure it completes the milestones.

56. All reports, notifications, documentation, submissions, and other correspondence required to be submitted by this Order must be submitted to EPA electronically, to the extent possible. If electronic submittal is not possible, the submissions must be made by certified mail (return receipt requested). Electronic submissions must be sent to the following addresses: r5weca@epa.gov, maraldo.dean@epa.gov, and cahn.jeff@epa.gov, with a courtesy copy to Zorica.Dejanovic@epa.ohio.gov. The subject line of all email correspondence must include the facility name, NPDES ID #OH0006912, and the subject of the deliverable. All electronically-submitted materials must be in final and searchable format, such as Portable Document Format (PDF) with Optical Character Recognition (OCR) applied. Mailed submissions must be sent to the following addresses:

11

Attn: Dean Maraldo, EPA Case Manager
Water Enforcement and Compliance Assurance Branch (ECW-15J)
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard
Chicago, Illinois 60604-3590

Attn: Jeffrey A. Cahn
Office of Regional Counsel (C-14J)
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard
Chicago, Illinois 60604-3590

Courtesy copy to:
Attn: Zorica Dejanovic
Ohio EPA – Northeast District Office
2110 East Aurora Road
Twinsburg, Ohio 44087

57. EPA may require additional status reports, or fewer status reports, for the purpose of documenting the progress of the Work performed pursuant to this Order or compliance with the Permit requirements. If EPA requires additional status reports, then EPA will provide Respondent with at least 15 days' time from the date of EPA's request to submit the reports.

58. All reports, notifications, documentation, and submissions required by this Order must be signed by a duly authorized representative of Respondent as specified by 40 C.F.R. § 122.22(b) and (d) and must include the following statement:

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

59. Respondent may not withhold information based on a claim that it is confidential. However, pursuant to 40 C.F.R. Part 2, Subpart B, Respondent may assert a claim of business confidentiality regarding any portion of the information submitted in response to this Order. The manner of asserting such claims is specified in 40 C.F.R. § 2.203(b). Certain information related to effluent data (as defined in 40 C.F.R. § 2.302(a)(2)) and NPDES permit applications may not be entitled to confidential treatment. 40 C.F.R. § 122.7. Information subject to a business confidentiality claim is available to the public only to the extent, and by

12

Republic Steel Canton Hot Roll Plant

means of the procedures, set forth in 40 C.F.R. Part 2, Subpart B. If Respondent does not assert a claim of business confidentiality when it submits the information, EPA may make the information available to the public without further notice. 40 C.F.R. § 2.203(c).

60. If Respondent finds at any time after submitting information that any portion of that information is false or incorrect, the Respondent must notify EPA immediately. Knowingly submitting false information to EPA may subject Respondent to criminal prosecution under Section 309(c) of the CWA, 33 U.S.C. § 1319(c), as well as 18 U.S.C. § 1001 and 1341.

61. Submissions required by this Order will be deemed submitted on the date they are sent electronically or on the date postmarked if sent by U.S. mail.

62. After review of the submissions required pursuant to paragraphs 54, 55, 57, and 83 of this Order, EPA may approve or disapprove the submissions, in whole or in part. EPA shall approve the submissions or any portion so long as the submissions fulfill the requirements under this Order.

63. If EPA disapproves the submission(s), EPA will notify Respondent in writing, which may include notice by email, and EPA may require Respondent to supplement or modify its submission(s). Within 30 days after receipt of written notice of EPA's disapproval, Respondent must submit a corrected submission to EPA for approval. If Respondent's modified submission is disapproved in whole or in part by EPA, then EPA may require Respondent to correct the deficiencies or EPA may determine that the submission fails to meet the requirements of this Order.

64. Respondent may object in writing to the notice of disapproval within 10 days of receiving the notice, and the parties will have 30 days from EPA's receipt of Respondent's objection to reach an agreement. If the parties cannot reach an agreement, EPA will give Respondent a written decision on the objection, which may require Respondent to correct, modify, or supplement its submission(s). If Respondent fails to undertake these corrections as required by EPA, EPA may determine that the submissions fail to meet the requirements of this Order.

65. Notwithstanding the receipt of a notice of disapproval pursuant to paragraph 63, above, Respondent must proceed to take all actions and provide all submissions required under this Order, including any actions required under any non-deficient portion(s) of its submission, if such action can be undertaken independent of the deficient portion of Respondent's submission.

66. Absent an extension of time granted in writing by EPA, EPA may determine that late submissions fail to meet the requirements of this Order.

67. Upon EPA approval, submissions by Respondent are incorporated and enforceable as part of this Order. In case of inconsistency between any submission by Respondent and this

13

Republic Steel Canton Hot Roll Plant

document and its subsequent modifications, this document and its subsequent modifications shall control.

68. Subject to the applicable rules of evidence, EPA may use any information submitted in response to this Order in support of an administrative, civil, or criminal action against Respondent.

69. The information required to be submitted pursuant to this Order is not subject to the approval requirements of the Paperwork Reduction Act of 1995, 44 U.S.C. § 3501 *et seq.*

## VII. DESIGNATED PROJECT COORDINATORS

70. The Parties have designated their respective Project Coordinators as follows:

    a.   For EPA:      Dean Maraldo
                        EPA Case Manager
                        Water Enforcement and Compliance Assurance Branch (ECW-15J)
                        U.S. Environmental Protection Agency, Region 5
                        77 West Jackson Boulevard
                        Chicago, Illinois  60604-3590

    b.  For Respondent:   Mark Clark
                        Director of Environmental Health & Safety
                        Republic Steel
                        2633 8th Street N.E.
                        Canton, Ohio 44704

71. The Respondent Project Coordinator shall oversee implementation of this Consent Order.

72. The EPA and Respondent each may change their respective Project Coordinator by giving the other Parties advance written notice.

## VIII. GENERAL PROVISIONS

73. Respondent has had the opportunity to confer with and submit information to EPA concerning the validity and provisions of this Order.

74. The terms of this Order are binding on Respondent and its assignees and successors. Respondent must give notice of this Order to all successors in interest prior to transferring ownership, and must simultaneously verify to EPA, at the addresses specified in paragraph 56, that Respondent has given the notice.

75. The undersigned signatory for each party has the authority to bind each respective party to the terms and conditions of this Order.

14

Republic Steel Canton Hot Roll Plant

76. Failure to comply with this Order may subject Respondent to penalties up to $54,833 per day for each violation (or as penalty levels may be later adjusted at 40 C.F.R. Part 19) pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and 40 C.F.R. Part 19.

77. This Order does not affect Respondent's responsibility to comply with the CWA, its Permit(s), and any other local, state, and federal laws, regulations, or permits.

78. This Order does not restrict EPA's authority to enforce the Permit or any section of the CWA or its implementing regulations.

79. EPA reserves all rights and remedies, legal and equitable, available to address any violation cited in this Order and any other violation of the CWA or of this Order. Neither issuance of this Order by EPA nor compliance with its terms precludes further enforcement action pursuant to Section 309 of the CWA, 33 U.S.C. § 1319, for the violations cited in this Order, for any other violations of the CWA or of this Order committed by Respondent.

80. The CWA includes provisions for administrative penalties, for civil injunctive relief and penalties, and for criminal penalties for violations of the CWA. Specifically, EPA may:

   (a) assess civil administrative penalties under 33 U.S.C. § 1319(g) and 40 C.F.R. Part 19 of up to $21,933 per day of violation up to a total of $274,159, for violations of Section 301 of the CWA that occurred after November 2, 2015 and for which penalties are assessed on or after February 6, 2019;
   (b) seek civil injunctive relief and penalties for violations of the CWA under 33 U.S.C. § 1319(b) and civil judicial penalties for violations of this Order under 33 U.S.C. § 1319(d). In accordance with 40 C.F.R. Part 19, EPA may seek civil judicial penalties of up to $54,833 per day of violation for violations that occurred after November 2, 2015 and for which penalties are assessed on or after February 6, 2019, or as penalty levels may be later adjusted at 40 C.F.R. Part 19; and
   (c) seek criminal penalties, including fines and imprisonment, for negligent or knowing violations of the CWA under 33 U.S.C. § 1319(c).

## IX. EFFECTIVE DATE

81. This Order shall become effective upon signature by EPA below and will remain in effect until EPA has notified Respondent of termination of the Order pursuant to paragraphs 82 or 84.

## X. FINAL REPORT AND TERMINATION OF THIS ORDER

82. EPA may terminate this Order at any time by written notice to Respondent.

15

Republic Steel Canton Hot Roll Plant

83. Absent the notice described in paragraph 82 and within 30 days after Respondent concludes that it has achieved compliance with all requirements of this Order, Respondent must submit to the EPA Case Manager a written final report and certification of completion describing all actions taken to comply with all requirements of this Order. Respondent must follow the procedures set forth at Section VI of this Order.

84. After receipt and review of Respondent's final report and certification of completion submitted pursuant to paragraph 83, EPA will notify Respondent whether it has satisfied all requirements of this Order under the procedures set forth at Section VI of this Order. If EPA concludes that Respondent has failed to satisfy the requirements of this Order, EPA may require further actions as set forth under this Order or it may pursue administrative or civil judicial actions.

IT IS SO AGREED AND ORDERED:

FOR RESPONDENT, REPUBLIC STEEL:


_____     3-6-2020
Signature                            Date

JOHN R WILKINSON
Name

Senior Executive Vice President.
Title



FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:


Michael D. Harris                    3/11/2020
Michael D. Harris                    Date
Division Director
Enforcement and Compliance Assurance Division
U.S. EPA Region 5


16

ATTACHMENT A

Effluent Limit Exceedances Report
OH0006912: REPUBLIC STEEL CANTON FACILITY, CANTON, OH 44704-2311
Monitoring Period Date Range: 01/01/2018 to 12/31/2019

Exceedance Details

| Monitoring Period Date | Outfall | Parameter Description | Limit Type | DMR Value | Limit Value Qualifier | Limit Value | DMR Value Unit |
|---|---|---|---|---|---|---|---|
| 1/31/2018 | 601 | Lead, total recoverable | DAILY MX | 2.48 | <= | 1.84 | kg/d |
| 1/31/2018 | 601 | Lead, total recoverable | MO AVG | 1.31 | <= | 0.62 | kg/d |
| 8/31/2018 | 10 | Selenium, total recoverable | MO AVG | 0.062 | <= | 0.0058 | mg/L |
| 8/31/2018 | 10 | Chlorine, total residual | DAILY MX | 0.07 | <= | 0.022 | mg/L |
| 9/30/2018 | 10 | Selenium, total recoverable | MO AVG | 0.027 | <= | 0.0058 | mg/L |
| 9/30/2018 | 10 | Chlorine, total residual | DAILY MX | 0.07 | <= | 0.022 | mg/L |
| 9/30/2018 | 10 | Mercury, total low level | MO AVG | 1.4E-05 | <= | 1.2E-05 | mg/L |
| 9/30/2018 | 10 | Toxicity, ceriodaphnia chronic | MO AVG | 4.3 | <= | 2.44 | tox chronic |
| 10/31/2018 | 601 | Solids, total suspended | MO AVG | 1140 | <= | 68.1 | kg/d |
| 10/31/2018 | 601 | Solids, total suspended | DAILY MX | 2280 | <= | 188 | kg/d |
| 12/31/2018 | 10 | Selenium, total recoverable | MO AVG | 0.011 | <= | 0.0058 | mg/L |
| 12/31/2018 | 10 | Selenium, total recoverable | MO AVG | 0.051 | <= | 0.0374 | kg/d |
| 2/28/2019 | 10 | Selenium, total recoverable | MO AVG | 0.017 | <= | 0.0058 | mg/L |
| 2/28/2019 | 10 | Selenium, total recoverable | MO AVG | 0.35 | <= | 0.0374 | kg/d |
| 2/28/2019 | 10 | Zinc, total recoverable | DAILY MX | 4.34 | <= | 2.97 | kg/d |
| 2/28/2019 | 10 | Mercury, total low level | MO AVG | 1.4E-05 | <= | 1.2E-05 | mg/L |
| 2/28/2019 | 10 | Mercury, total low level | MO AVG | 0.00029 | <= | 0.00008 | kg/d |
| 3/31/2019 | 10 | Selenium, total recoverable | MO AVG | 0.047 | <= | 0.0374 | kg/d |
| 3/31/2019 | 10 | Selenium, total recoverable | MO AVG | 0.013 | <= | 0.0058 | mg/L |
| 5/31/2019 | 10 | Selenium, total recoverable | MO AVG | 0.11 | <= | 0.0374 | kg/d |
| 5/31/2019 | 10 | Selenium, total recoverable | MO AVG | 0.038 | <= | 0.0058 | mg/L |
| 5/31/2019 | 10 | Chlorine, total residual | DAILY MX | 0.12 | <= | 0.022 | mg/L |
| 7/31/2019 | 10 | Selenium, total recoverable | MO AVG | 0.021 | <= | 0.0058 | mg/L |
| 7/31/2019 | 10 | Chlorine, total residual | DAILY MX | 0.12 | <= | 0.022 | mg/L |
| 8/31/2019 | 10 | Chlorine, total residual | DAILY MX | 0.06 | <= | 0.022 | mg/L |
| 8/31/2019 | 10 | Mercury, total low level | MO AVG | 0.000096 | <= | 0.00008 | kg/d |
| 9/30/2019 | 10 | Chlorine, total residual | DAILY MX | 0.07 | <= | 0.022 | mg/L |
| 10/31/2019 | 10 | Oil and grease, hexane extr method | DAILY MX | 30 | <= | 10 | mg/L |
| 11/30/2019 | 10 | Chlorine, total residual | DAILY MX | 0.11 | <= | 0.022 | mg/L |

17

Republic Steel Canton Hot Roll Plant

[This page intentionally left blank]

18

Republic Steel Canton Hot Roll Plant

ATTACHMENT B

U.S. EPA identified missing or deficient SWPPP components

| Permit SWPPP Requirement | Deficiency |
|---|---|
| Permit part IV.H. The plan shall be signed and dated in accordance with Part III, Item 28, and be retained on-site at the facility which generates the storm water discharge. | SWPPP not signed.  Inconsistent plan dates throughout document. |
| Permit part IV.J.2.a.ii. A general location map (e.g. U.S. Geologic Survey (USGS) quadrangle map) with enough detail to identify the location of your facility and all receiving waters for your storm water discharges. | General location map not included in SWPPP.  The SWPPP includes a cover sheet for "Figure 1 Site Map" dated 9/22/2004.  However, the outdated map was not included in SWPPP. |
| Permit part IV.J.2.a.iii. A site map showing<br>• The size of the property in acres;<br>• The location and extent of significant structures and impervious surfaces;<br>• Directions of storm water flow (use arrows);<br>• Locations of all existing structural control measures;<br>• Locations of all receiving waters in the immediate vicinity of your facility;<br>• Locations of all storm water conveyances including ditches, pipes and swales; Locations of potential pollutant sources identified under Part IV J. 2.b;<br>• Locations where significant spills or leaks identified under Part IV J. 2.b. have occurred;<br>• Locations of all storm water monitoring points;<br>• Locations of storm water inlets and outfalls, with a unique identification code for each outfall (e.g. Outfall 001, Outfall 002, etc), indicating any outfalls that are considered substantially identical to another outfall, and an approximate outline of the areas draining to each outfall;<br>• Municipal separate storm sewer systems, where your storm water discharges to them;<br>• Locations and descriptions of all non-storm water discharges identified under Part IV. C.10;<br>• Locations of the following activities where such activities are exposed to precipitation<br>  ▪ Fueling stations;<br>  ▪ Vehicle and equipment maintenance and/or cleaning areas;<br>  ▪ Loading/unloading areas;<br>  ▪ Immediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility;<br>  ▪ Transfer areas for substances in bulk;<br>  ▪ Machinery; and | Site map not included in SWPPP.  The SWPPP includes a cover sheet for "Figure 1 Site Map" dated 9/22/2004.  However, the outdated map was not included in SWPPP. |

19

Republic Steel Canton Hot Roll Plant

| Permit SWPPP Requirement | Deficiency |
|---|---|
| • Locations and sources of run-on to your site from adjacent property that contains significant quantities of pollutants. | |
| **Permit part IV.J.2.d.** Sampling Data. A summary of existing discharge sampling data describing pollutants in storm water discharges from the facility. | Summary of existing discharge sampling data describing pollutants in storm water discharges from the facility not included in SWPPP. |
| **Permit part IV.J.2.e.** Non-Storm Water Discharges. You shall document that you have evaluated for the presence of non-storm water discharges and that all unauthorized discharges have been eliminated. Documentation of your evaluation shall include: 1) The date of any evaluation; 2) A description of the evaluation criteria used; 3) A list of the outfalls or onsite drainage points that were directly observed during the evaluation; 4) The different types of non-storm water discharge(s) and source locations; and 5) The action(s) taken, such as a list of control measures used to eliminate unauthorized discharge(s), if any were identified. | Non-Storm water discharge evaluation documentation incomplete, including evaluation criteria; a list of the outfalls or onsite drainage points that were directly observed during the evaluation; the different types of non-storm water discharge(s) and source locations, and the action(s) taken, such as a list of control measures used to eliminate unauthorized discharge(s), if any were identified. |
| **Permit part IV.J.4.a.i.** Good Housekeeping (See Part IV.C.2) – A schedule for regular pickup and disposal of waste materials, along with routine inspections for leaks and conditions of drums, tanks and containers. | SWPPP lacks schedules for regular pickup and disposal of waste materials, and routine inspections for leaks and conditions of drums, tanks and containers. |
| **Permit part IV.J.4.a.ii.** Maintenance (See Part IV.C.3) – Preventative maintenance procedures, including regular inspections, testing, maintenance, and repair of all industrial equipment and systems, and control measures, to avoid situations that may result in leaks, spills, and other releases, and any back-up practices in place should a runoff event occur while a control measure is off-line. | SWPPP lacks description of preventive maintenance procedures. |
| **Permit part IV.J.4.a.iv.** Employee Training (See Part IV.C.9) – A schedule for all types of necessary training. | SWPPP does not describe the types of necessary training for different roles and schedules for each type of training. |
| **Permit part IV.J.4.b.** Pertaining to Monitoring and Inspection. Where applicable, you shall document in your SWPPP your procedures for conducting analytical storm water monitoring. You shall document in your SWPPP your procedures for performing, as appropriate, the three types of inspections specified by this permit, including: 1) Routine facility inspections (See Part IV.E.1), 2) Quarterly visual assessment of storm water discharges (See Part IV.E.2), and 3) Comprehensive site inspections (See Part IV.E.3). | SWPPP does not include procedures for conducting analytical storm water monitoring; and routine, quarterly, and comprehensive site inspections. |
| **Permit part IV.J.5.** Documentation Requirements. You are required to keep inspection, monitoring, and certification records with your SWPPP that together keep your records complete and up-to-date and demonstrate your full compliance with the conditions of this permit. | SWPPP does not include inspection, monitoring, and certification records. |

Republic Steel Canton Hot Roll Plant

| Permit SWPPP Requirement | Deficiency |
|---|---|
| **Permit part IV.K.2.a.**  Additional SWPPP Requirements. Drainage Area Site Map. (See also Part IV.J.2.a) Identify in the SWPPP where any of the following activities may be exposed to precipitation or surface runoff: storage or disposal of wastes such as spent solvents and baths, sand, slag and dross; liquid storage tanks and drums; processing areas including pollution control equipment (e.g., baghouses); and storage areas of raw material such as coal, coke, scrap, sand, fluxes, refractories, or metal in any form. In addition, indicate where an accumulation of significant amounts of particulate matter could occur from such sources as furnace or oven emissions, losses from coal and coke handling operations, etc., and could result in a discharge of pollutants to surface waters of the State. | Drainage Area Site Map not included in SWPPP. |

21

Republic Steel Canton Hot Roll Plant

[This page intentionally left blank]

22

Republic Steel Canton Hot Roll Plant

ATTACHMENT C

*Storm Water Finding Summary: Ohio Environmental Protection Agency NPDES Inspection Report* for the Facility, dated November 6, 2019.  Except as otherwise indicated, all items listed below shall be addressed as part of the compliance with paragraph 54(e).

| | |
|---|---|
| 1. | Test America is only sampling three SW Outfalls: 006, 024 and 034. Part V.B of the NPDES permit indicates wet weather benchmark monitoring is also applicable to SW Outfalls 008, 020, 022, 025, 027, 028, 029, 030, 031, 032 and 033. The Storm Water Pollution Prevention Plan (SWPPP) does not identify or list any substantially identical outfalls. |
| 2. | Copies of quarterly visual assessments, routine facility inspections, comprehensive annual inspections, annual reports and employee training were not available as required by Section IV.J.5 of your NPDES permit. Mark stated that routine facility inspections were not conducted until recently. |
| 3. | Roll-offs for municipal waste are located across the property. Most of them are full and uncovered. Some dumpsters have waste placed on the ground next to them. Some roll-offs are corroded with holes at the bottom. Mark stated that Republic Steel has not paid for the removal of these wastes in some time. Controls for waste, garbage and floatable debris are required by Part IV. C.11 of the NPDES permit. Please replace the corroded roll-offs and put waste collection on a schedule. |
| 4. | Most of the catch basins throughout the property are sediment laden and lack inlet protection. Storm drain inlet protection is recommended throughout the facility where dust and stockpiles of erodible material exist. |
| 5. | Outfall 024: The contributing drainage area is a steel bar storage yard. There was no flow at the time of the inspection and no significant sediment observed. The outfall discharges to a storm sewer on 8th Street. Grass/vegetation in the area has not been maintained and there are sections of exposed dirt. Please maintain the grass filter strips located between the rows of bar storage. |
| 6. | Outfall 025: The contributing drainage area includes runoff from old refractory brick and fine slag storage piles. Runoff appears to flow down toward an old Fire House rather than to the location of the outfall sign. The location of this outfall needs to be reevaluated. |
| 7. | Station 601 (Effluent from On-Site WWTP): We noted a leak onto the ground from the Backwash Water Out Tank from a spot previously patched for repair. Please repair this leak. |
| 8. | 12-Inch Mill Scale Pit/Loading/Transfer Area (Area E on site map): We noted a pile of dewatered mill scale placed outside of the containment area. The back of the pile drains to a storm water catch basin. Please keep the material within the containment area. |
| 9. | 12-Inch Mill Scale Pit/Loading/Transfer Area (Area E on site map): The floor of the room inside the Metallurgical Laboratory Building appears to have been hosed off with flow discharging outside onto the ground. Part IV.C.10 of the NPDES permit only allows the discharge of pavement wash waters where no detergents are used and no spills or leaks of toxic or hazardous materials have occurred (unless all spilled material has been removed). Mark stated that three catch basins outside the building are connected to the sanitary sewers. Please label the catch basins that have been confirmed to be connected to sanitary sewers so that they can be easily identified. |
| 10. | 12-Inch Mill Scale Pit/Loading/Transfer Area (Area E on site map)/Storeroom: There is an open trench along the side of the building with several possible unauthorized non-storm water discharges including a white three-inch diameter pipe sticking out of building, and an eight-inch diameter pipe coming from under the floor of the building.  [Address through submission of report pursuant to paragraph 54(a) of the Order] |

23

Republic Steel Canton Hot Roll Plant

| | |
|---|---|
| 11. | 12-inch Mill Scale Pit/Loading/Transfer Area (Area E on site map): We noted a waterline leak (by receiving room truck station 29) that has not been repaired for six to seven months. Flow from the broken waterline was entering the storm water catch basins. Mark stated there are additional broken waterlines on the property and believes these to be the source of the chlorine exceedance at Outfall 010. |
| 12. | Quality Value Line (QVL): There is a storage pile of material outside the QVL building. The material may be slag or dewatered mill scale. Mark is unsure. He stated that dried mill scale is disposed of as a solid waste at a landfill. There are no BMPs to prevent storm water which contacts this pile from discharging off site. |
| 13. | Quality Value Line (QVL): The ground is very dusty in this area, and the pavement is deteriorated. Please repave so the area can be swept for dust control. |
| 14. | Quality Value Line (QVL): There is a sump northeast of the 12-inch Scale Pit. It appeared a hose was set up to pump the contents of the sump to a storm water catch basin. This is a potential unauthorized non-storm water discharge. The ground is very dusty in this area, and the pavement is deteriorated. Please repave so the area can be swept for dust control. [Address through submission of report pursuant to paragraph 54(a) of the Order] |
| 15. | Quality Value Line (QVL): There is a two-inch diameter rubber hose discharging condensate from the "air receiver" in QVL Shipping Building. Please identify this in your SWPPP along with all non-storm water discharges. Part IV.C.10 of your NPDES permit lists authorized non-storm water discharges. All unauthorized non-storm water discharges must be eliminated. [Address through submission of report pursuant to paragraph 54(a) of the Order] |
| 16. | Quality Value Line (QVL): The glycol tank on the south side of the QVL building is within secondary containment made of bricks. There are some cracks in the containment structure, but no evidence of leaks. There is a hose connection point outside of the containment area. The tank is not labeled, and there is no drip bucket at the hose connection point. Please repair the cracks in the containment structure and add a drip bucket or signage to help prevent spills. |
| 17. | Outfall 011: The SWPPP states non-contact cooling water, service water, freeze protection water, steam condensate, storm water and ground water contribute to this outfall. It was discharging at time of inspection. Heavy sedimentation was noted in the receiving channel at end of pipe. Please incorporate enhanced dust controls and storm drain inlet protection for this drainage area. |
| 18. | Boiler House: The two natural gas boilers operate continuously. Salt, used for water softening, is fed to the system from a grating located on the outdoor containment pad. The containment walls around the salt pile are cracked. The salt pile was not covered. Please repair the containment walls and enclose the salt pile as required by Part IV.C.7 of your NPDES permit. |
| 19. | No. 5 Steel Conditioning Building (Area M on site map): Mark believes this area discharges to Outfall 008. This is a storage area for shop blast and steel grindings. The material is stored in roll-offs but there are some piles on the ground (particularly outside Truck Station 111 and 112). There is a catch basin east of the building behind the roll-offs. Some roll offs are not tarped. Liners within the dumpsters have slipped allowing potential leakage. Some of the sacks containing material were ripped open within the roll offs. |
| 20. | No. 5 Steel Conditioning Building (Area M on site map): We noted spillage of shop blast and steel grindings outside every truck station door. Also, there is significant spillage along the north side of building (likely emitted from the building; there are some doors, louvres and siding). Please install dust curtains for the doors or a better dust collection system for the building. Please cover all roll-offs, and if possible, locate them away from storm drains. |
| 21. | No. 5 Steel Conditioning Building (Area M on site map): We noted grindings dust on the ground |

| | |
|---|---|
| | along the train tracks outside the building. Mark stated that some of the rail cars have drain holes and the plugs may not be in place in some cars. |
| 22. | No. 5 Steel Conditioning Building (Area M on site map): Spills were noted outside of the containment wall to the glycol tank. This probably occurs when the hose is disconnected. Please ensure the hose residue drains back within the secondary containment and all employees are trained on spill prevention and response procedures. |
| 23. | No. 5 Steel Conditioning Building (Area M on site map): Former Outdoor Drum Storage Area: The drums were removed but soil contaminated by spilled material remains. We also noted some trash and debris on the ground in this area. Please clean up and properly dispose of the trash and contaminated soil. |
| 24. | No. 5 Steel Conditioning Building (Area M on site map): Maintenance and Repair Shop: We noted oil stains on the ground outside the maintenance and repair building for this area. Please move leaking equipment or vehicles inside or place drip pans under the leaks. Please do not leave oily rags on the ground. Contaminated ground where leaks have occurred should be cleaned. |
| 25. | Outfall 003: There were oil spills along the railroad tracks and in the grooves in the rails. Some Oil-Dri (palletized oil absorbent) had been applied but appeared to be insufficient. Mark stated that locomotives are constantly leaking and there is no real way to prevent it because they are old. Please consider building containment within the tracks to catch leaks. |
| 26. | Melt Shop (Area P): Molten slag is being cooled outside, on the south side of the building, with a water cannon. The contact cooling water was observed draining into a storm water catch basin believed to be tributary to Outfall 003. Mark believes this area is tributary to Outfall 034, but that doesn't seem to be consistent with our observations. This discharge is not authorized by the NPDES permit. A modification to the NPDES permit to include this process is required. Mark stated that the water cannon was installed due to requirements of the local air agency approximately 13 months ago. The outdoor cooling is a temporary operation. Republic Steel is looking at options such as relocating to a roofed area (inside the Bottoms 4 area) or direct placement of molten slag into a truck or ladle to contain while cooling rather than placement on the ground. No schedule to implement more permanent options was provided. We informed Mark that this is wastewater and should be contained and pumped to the on-site WWTP. The catch basin on the eastern side of the Bottoms 4 contained the same milky flow as the catch basin in front of the Melt Shop. Please determine the discharge location of all the catch basins in this area. |
| 27. | Melt Shop (Area P): Refractory waste and other erodible materials (possibly slag) are stored on the ground on the ramp behind the flex caster section (ramp to Melt Shop #3 on the Investigative Areas map). This area flows to a storm water catch basin. There is no inlet protection in place. |
| 28. | Dry Material Hopper (Building 57): The hopper is located at the back of the flex caster section. We observed a hose from the hopper basement into a storm water catch basin under the hopper. Mark stated that they dewater the basement to the storm sewer system as needed. Mark was informed that this is an unauthorized non-storm water discharge. There is spilled material all over the floor in this area. We also observed a diesel fuel tank near a storm water catch basin near the door of the hopper. There is no secondary containment provided and no spill kit nearby. [Address through submission of report pursuant to paragraph 54(a) of the Order] |
| 29. | LMF (Ladle Metallurgical Facility "mini furnace"): baghouse dust is stored within a covered dumpster. We observed spills on the ground under the hopper. This dust can contain lead and selenium and may be a hazardous waste. |
| 30. | LMF (Ladle Metallurgical Facility "mini furnace"): The area is not paved, and the dust was several inches thick. Mark stated that the whole road is watered for dust control, but the application rate |

25

| | |
|---|---|
| | may be too high, causing dust to discharge to the storm sewers. He also stated that the area is vacuumed quarterly. This frequency appears insufficient. |
| 31. | LMF (Ladle Metallurgical Facility "mini furnace"): Trash and debris by Caster Station #103 were observed on the ground instead of in a dumpster. |
| 32. | The Pump House: We noted discharge to a storm water catch basin located at the southwest corner of the Pump House. There are holes in the floor of the Chiller tower allowing discharge onto the ground below and into storm water catch basins. Mike Bland stated this could be a mix of contact and non-contact cooling water. This is likely an unauthorized non-storm water discharge. Preventative maintenance is a required storm water control measure per Part IV.C.3 of the NPDES permit. [Address through submission of report pursuant to paragraph 54(a) of the Order] |
| 33. | The Outdoor Slag Storage/Reclamation Area is operated by a contractor (Stein). Mark stated that Stein collects, processes and sells the slag. We did not fully review this area, but the slag storage piles are significant. According to the SWPPP, there are no storm water catch basins in this area. Surface (sheet) flow to catch basins and the East Branch Nimishillen Creek is likely. We observed evidence of a sheet flow discharge to the creek near Outfall 034. The entire area gets very dusty (several inches thick) when dry. The water truck only sprays the haul road. Large areas (several acres) are open and exposed to erosion. The slag piles are very large. Please consider a sediment basin for this area. |
| 34. | Praxair rents a portion of the property. Condensate was discharging into what appears to be some sort of culvert. Uncontaminated condensate from outdoor storage of refrigerated gases and liquids should be identified in the SWPPP. |
| 35. | Melt Shop Bag house Area (EAF Dust Collectors): We noted EAF dust (red) spilled on the pavement under the baghouse. There are catch basins within the pavement that appear to connect to the storm water drainage system. The EAF dust is also windblown onto the ground around this area where runoff would convey it to the southwest drainage system. The collected EAF dust is shipped via rail to a facility in Mexico where zinc is reclaimed. The train car loading area is under roof, but we observed track out onto the railroad tracks outside the roof. |
| 36. | Melt Shop Bag house Area (EAF Dust Collectors): Diesel fuel has been spilled on the ground by the trash dumpsters. Mark is not sure when the spill occurred. The trash dumpsters are in poor condition (corroded with holes), full, with the lids open. |
| 37. | Scale Pits at the CBCF: We observed some spillage of mill scale outside the second scale pit containment area. |
| 38. | Scale Pits at the CBCF: We noted a discharge pipe of unknown purpose on the backside of the chiller unit. This could be another unauthorized non-storm water discharge. Please identify the nature of the discharge. [Address through submission of report pursuant to paragraph 54(a) of the Order] |
| 39. | Scale Pits at the CBCF: The trash dumpsters in this area are also full and overflowing. |
| 40. | Scale Pits at the CBCF: A lime storage pile is stored inside the old Ford Building right at the door. There is some track-out to the outside of the building. It appears that vehicles are driving over a part of the pile causing the track-out. Please use good housekeeping practices to sweep lime back under roof if it is being tracked out and leave a clear pathway for equipment to pass by the pile. |
| 41. | Outfall 034 is one of the monitored storm water outfalls. There was no discharge at the time of the inspection. There appear to be multiple outfalls at this location. The outfall sign is posted by the end of the Hardin Creek culvert, but there are sheet flow discharges from the slag processing yard as well as a piped discharge from what was indicated to be "overflow" from Hardin Creek, i.e., when the culvert reaches capacity, there is a catch basin structure that overflows, runs through a |

26

Republic Steel Canton Hot Roll Plant

channel and is piped across a haul road toward the East Branch Nimishillen Creek. However, we observed that the open channel between the catch basin structure and the pipe under the haul road does overflow and run across a slag stockpiling area. There is RCRA corrective action scheduled for this area for this autumn which will require reconfigurations of the drainage systems here. Neal stated that samples are currently taken at the end of the pipe across the haul road. Republic Steel must determine how many outfalls exist in this area and their location.

27

Republic Steel Canton Hot Roll Plant

# Exhibit 2

Lorain Facility
2021 AOC



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL  60604-3590

REPLY TO ATTENTION OF
ECW-15J

**<u>VIA ELECTRONIC MAIL</u>**

Mr. John Wilkinson
Republic Steel
2633 Eighth Street, NE
Canton, Ohio 44704

jwilkinson@RepublicSteel.com

Subject:    Administrative Order on Consent Under the Clean Water Act

Dear Mr. Wilkinson:

Enclosed please find the fully-executed Administrative Order on Consent (AOC) for compliance with the Clean Water Act (CWA) and the National Pollutant Discharge Elimination System (NPDES) permit (OH0001562) issued to the Republic Steel - Lorain Plant. The effective date of the AOC is the date the AOC was signed by EPA.  Please note that the AOC sets out measures to correct the alleged violations and bring the facility into compliance with the CWA and the facility's NPDES permit. The facility remains responsible for implementing all such compliance measures. As stated in the AOC, neither issuance of the AOC nor compliance with its terms precludes further enforcement action by EPA, including an action for penalties, under the CWA.

Thank you for your efforts to bring your facility into compliance with the CWA.  If you have any questions or concerns, please contact Dean Maraldo of my staff at (312) 353-2098 or maraldo.dean@epa.gov, or your legal counsel may contact Jeffrey Cahn, Associate Regional Counsel, at (312) 886-6670 or cahn.jeff@epa.gov.

Sincerely,

MICHAEL
HARRIS
<small>Digitally signed by
MICHAEL HARRIS
Date: 2021.06.09
12:56:06 -05'00'</small>

Michael D. Harris
Director
Enforcement and Compliance Assurance Division

Attachment B, page 29

Enclosure

cc:    Jim Hardy, Republic Steel [JHardy@RepublicSteel.com]
       Joseph P. Koncelik, Tucker Ellis LLP [joseph.koncelik@tuckerellis.com]
       Dean Stoll, Ohio EPA [dean.stoll@epa.ohio.gov]
       Brianne Workman, Ohio EPA [brianne.workman@epa.ohio.gov]

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
### REGION 5

| | |
|---|---|
| In the Matter of:         ) | |
|                   ) | **Administrative Order on Consent** |
| **Republic Steel,**       ) | **Under Section 309(a) of the Clean Water** |
|                   ) | **Act, 33 U.S.C. § 1319(a)** |
|      **Respondent.**     ) | |
|                   ) | |
| _____ ) | |

## I. <u>INTRODUCTION</u>

1. The U.S. Environmental Protection Agency ("EPA") makes the findings of fact set forth below (Section IV) and is issuing this Administrative Order on Consent ("Order on Consent" or "Order") to Republic Steel, owner of the Republic Steel Lorain Plant, ("Respondent") under the authority of Section 309(a) of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1319(a). The Administrator of EPA has delegated the authority to issue such orders to the Regional Administrator of EPA Region 5, who has redelegated this authority to the Director of the Enforcement and Compliance Assurance Division, EPA, Region 5.

2. EPA and Respondent voluntarily enter into this Order.

3. In accordance with Section 309(a)(4) of the CWA, 33 U.S.C. §1319(a)(4), EPA will provide notice and a copy of this Order on Consent to the Ohio Environmental Protection Agency ("Ohio EPA") upon execution.

4. At all times relevant to this Order, Respondent has owned and operated the Republic Steel Lorain Plant, located at 1807 E. 28th Street, Lorain, Ohio (the "Facility").

5. EPA alleges that Respondent failed to comply with National Pollutant Discharge Elimination System ("NPDES") Permit No. OH0001562 at the Republic Steel Lorain Plant, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

6. Respondent believes that since the Facility has been idle, only groundwater and storm water, including groundwater and storm water originating offsite, have been discharged from Facility Outfalls No. 002 and No. 005.

7. By entering into this Order, Respondent: (1) consents to EPA's authority to issue this Order; (2) neither admits nor denies the factual allegations or conclusions of law as set forth in this Order; (3) does not admit liability or waive any defenses to the allegations made herein; (4) agrees to undertake all actions required by the terms and conditions of this Order; and (5)

1

agrees not to contest the authority of EPA to issue this Order or the validity of any terms or conditions in this Order.

8. For the purposes of this Order only, Respondent waives any and all remedies, claims for relief, and otherwise available rights to judicial or administrative review that Respondent may have with respect to any issue of fact or law set forth in this Order on Consent, including, but not limited to, any right of judicial review under Chapter 7 of the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## II. STATUTORY AUTHORITY

9. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person except, *inter alia*, in compliance with an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

10. Section 402 of the CWA, 33 U.S.C. § 1342, authorizes states to request approval from EPA to administer their own permit programs for discharges into navigable waters within their jurisdictions.

11. Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the State of Ohio requested approval from EPA to administer its own permit program for discharges into navigable waters within Ohio, and such approval was granted by EPA on March 11, 1974, 39 Fed. Reg. 26,061 (July 16, 1974). Therefore, pursuant to the State's permit program, the Ohio EPA has issued Ohio EPA NPDES permits. Violation of an NPDES permit is a violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

12. Section 309(a)(3) of the CWA, 33 U.S.C. § 1319(a)(3), provides that whenever EPA finds that any person is in violation of requirements of, *inter alia*, Sections 301, 308, or 402 of the CWA, 33 U.S.C. § 1311, 1318, 1342, or is in violation of any condition or limitation that implements those sections in an NPDES permit, EPA shall issue an order requiring such person to comply with such requirements, conditions, or limitations. Section 309(a)(5) of the CWA, 33 U.S.C. § 1319(a)(5), requires that any such order shall specify a time for compliance that EPA determines to be reasonable taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements.

## III. DEFINITIONS

13. All terms used, but not defined, in this Order have the meanings provided to them in the CWA, 33 U.S.C. § 1251 *et seq.*, and the effective EPA regulations promulgated under the CWA.

14. "Act" or "CWA" means the Clean Water Act, 33 U.S.C. § 1251 *et seq.*

Republic Steel Lorain Plant

15. "Day" or "days" means a calendar day or calendar days unless expressly stated to be a business day. When computing any period of time under this Order, should the last day fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

16. "Discharge of a pollutant," as defined in Section 502(12) of the CWA, means *inter alia*, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

17. "Effective Date" has the definition provided in Section IX of this Order.

18. "EPA" means the United States Environmental Protection Agency.

19. "Facility" means the Republic Steel Lorain Plant located at 1807 E. 28th Street, Lorain, Ohio.

20. "MGD" means millions of gallons per day.

21. "Navigable waters," as defined in Section 502(7) of the CWA, means "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

22. "NPDES Permit" and "Permit" mean the permit issued in accordance with the National Pollutant Discharge Elimination System (NPDES) pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. In this Order, these terms mean NPDES Permit No. OH0001562, issued by the State of Ohio to Respondent for the Republic Steel Lorain Plant with the effective date of July 24, 2013 (with March 1, 2016 modification), and the expiration date of December 31, 2017.  Respondent submitted an application for permit renewal to Ohio EPA on June 29, 2017. The July 24, 2013 Permit is administratively continued. For purposes of Sections IV through VIII of this Order, "Permit" also means any subsequent NPDES permit issued by the State of Ohio to Respondent for the Republic Steel Lorain Plant, until such time as this Order is terminated.

23. "Order on Consent" and "Order" means this document, all attachments hereto, and all subsequent modifications thereto, including incorporated submissions from Respondent, as described in paragraph 67.

24. "Outfall" means a type of "point source," as that term is defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14), that serves as a discharge point from the facility. "Outfall" followed by an Arabic numeral means that Outfall assigned that number in Respondent's NPDES permit.

25. "Paragraph" means a portion of this Order identified by an Arabic numeral.

26. "Parties" means the EPA and Respondent/Facility.

3

Republic Steel Lorain Plant

27. "Person," as defined in Section 502(5) of the CWA, means an "individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

28. "Point source," as defined in Section 502(14) of the CWA, means "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

29. "Pollutant," as defined in Section 502(6) of the CWA, means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

30. "Respondent" means Republic Steel, the owner of the Republic Steel Lorain Plant.

31. "State" means the State of Ohio.

32. "Ohio EPA" means the Ohio Environmental Protection Agency and any successor departments, agencies, or instrumentalities of the State.

33. The regulation at 40 C.F.R. § 122.2 (1993, 2015, and 2019)[1] defines the term "waters of the United States."

34. "Work" means any and all activities Respondent is required to undertake and accomplish to achieve compliance under this Order.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

35. Respondent is a corporation, so it is a "person," as defined in Section 502(5) of the CWA, 33 U.S.C. § 1362(5), and 40 C.F.R. § 122.2.

36. At all times relevant to this Order, Respondent owned and operated the Republic Steel Lorain Plant, an integrated steel mill facility, located in Lorain, Ohio.

37. The Facility has been idle since approximately March 2016, with the exception of a brief period of operation of the Bar Mill in mid to late 2018.

38. On approximately May 5, 2021, Respondent indicated that it is evaluating the potential restart of Bar Mill operations at the Facility.

---

1. 58 Fed. Reg. 45,038 (Aug. 25, 1993); 80 Fed. Reg. 37,114 (June 29, 2015); and 84 Fed. Reg. 56,669 (Oct. 22, 2019).

Republic Steel Lorain Plant

39. At all times relevant to this Order, Respondent is authorized to discharge pursuant to its NPDES Permit from Outfall No. 002 non-contact cooling water ("NCCW"), continuous casting spray water emergency overflow, continuous casting make-up filter backwash, softener regenerant, raw water sludge dewatering, groundwater, storm water, steam condensate, off-site discharges from the City of Lorain, discharge from the steelmaking wastewater treatment system (Outfall 612), non-contact cooling tower blowdown, boiler blowdown and boiler water treatment residuals.

40. At all times relevant to this Order, Respondent is authorized pursuant to its NPDES Permit to discharge from Outfall No. 005 final effluent from Bar Mills prior to discharging to the Clinton Avenue storm sewer concrete catch basin, which may include discharges from internal outfall 605, NCCW, storm water, groundwater, service water, and steam condensate.

41. On May 14, 2020, Ohio EPA issued Respondent permits-to-install ("PTIs") for a 50 gallon per minute and 150 gallon per minute oil/water separator as treatment to meet oil & grease effluent limits in Respondent's NPDES Permit when discharging to internal outfall 605 groundwater that accumulates in the Bar Mill and Rolling Mill scale pits.

42. Pollutants discharged from Outfall No. 002, Outfall No. 005, and into the Black River include: oil and grease, residual chlorine, mercury, and pH.

43. Outfall No. 002 and Outfall No. 005 at the Republic Steel Lorain Plant are "point sources," as defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

44. Oil and grease, chlorine, mercury, and pH are "pollutants," as defined in Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

45. The Black River is a river and "navigable water" within the meaning of Section 502 of the CWA, 33 U.S.C. § 1362, and "waters of the United States" within the meaning of 40 C.F.R. § 122.2 (1993, 2015, and 2019).

46. At all times relevant to this Order, the outfall(s) at the Facility acted as point sources of "discharges" of "pollutants" with its final wastewater discharge to the Black River.

47. Because Respondent owned or operated the Facility with outfalls that acted as point sources for the discharge of pollutants to navigable waters, Respondent and the Facility have been subject to the CWA at all times relevant to this Order. Thus, any such discharge has been and is subject to the specific terms and conditions prescribed in the applicable permit and the CWA.

48. Respondent applied for and was issued an NPDES Permit No. OH0001562 ("Permit") under Section 402 of the CWA, 33 U.S.C. § 1342, which became effective on July 24, 2013 (with

5

Republic Steel Lorain Plant

March 1, 2016 modification). Respondent submitted an application for permit renewal to Ohio EPA on June 29, 2017. The July 24, 2013 Permit is administratively continued. At all times relevant to this Order, Respondent was authorized to discharge pollutants from the Facility to navigable waters only in compliance with the specific terms and conditions of the Permit.

49. The Permit includes "Final Effluent Limitations and Monitoring Requirements" that require Respondent to sample and test its effluent and monitor its compliance with Permit conditions and applicable regulations, according to specific procedures, and places certain limitations on the quality and quantity of effluent discharged by Respondent. The Permit also requires Respondent to file certified Discharge Monitoring Reports ("DMRs") of the results of monitoring and Noncompliance Reports with Ohio EPA as appropriate. The relevant discharge limitations are specified in the Permit Part I.A., which is incorporated herein by reference.

50. Permittees must monitor discharges and report results in their DMRs, as required by their permits.

51. Certified DMRs filed by Respondent with Ohio EPA, as required by the Permit, show discharges of pollutants from Facility Outfall No. 002 and Outfall No. 005, from June 30, 2016 to February 28, 2021, that exceed the permitted effluent limitations as specified in Part I.A. of the Permit, which is incorporated herein by reference. The Permit effluent limitation exceedances are summarized in Attachment A to this Order.

52. Each of the discharges described in paragraph 51 are a "discharge of a pollutant," as defined in Section 502(12) of the CWA, 33 U.S.C. § 1362(12).

53. Respondent is a person who discharged pollutants from point sources into navigable waters, in violation of its Permit. Accordingly, each instance in which Respondent discharged pollutants to navigable waters in amounts exceeding the effluent limitations contained in the Permit is a violation of the Permit and Section 301 of the CWA, 33 U.S.C. § 1311.

## V. <u>ORDER ON CONSENT</u>

54. Based on the foregoing findings and the authority vested in the undersigned Director, Enforcement and Compliance Assurance Division, it is hereby ordered and agreed to in accordance with Section 309(a) of the CWA, 33 U.S.C. § 1319(a), that Respondent comply with the following actions:

(a) Effluent limit violations: Within 120 days after the effective date of this Order, Respondent must submit a plan for EPA's review and approval indicating whether Respondent will be restarting Bar Mill operations. The plan shall describe the specific actions to be taken to correct the total residual chlorine; mercury; and pH effluent

6

Republic Steel Lorain Plant

limitation violations summarized in Attachment A to this Order.  The plan shall indicate if Respondent is electing to restart bar mill operations or if the Facility will remain idle, and include only the plan to be implemented to correct the effluent limitation violations discussed above. The plan must include schedules including milestones and final compliance dates and estimated costs to complete all work necessary to correct the violations in accordance with the following:

    (1) Total residual chlorine (Outfalls No. 002 and 005): The plan must include a schedule to complete all work necessary to correct the total residual chlorine violations and achieve compliance with final permit effluent limits;

    (2) pH (Outfalls No. 002 and 005): The plan must include a schedule to complete all work necessary to correct the pH violations and achieve compliance with final permit effluent limits; and

    (3) Mercury (Outfalls No. 002 and 005): The plan must include a schedule to complete all work necessary, including potential submission of a revised mercury variance request with an interim mercury minimization plan, to correct the mercury violations and achieve compliance with final permit effluent limits.

(b) Upon EPA approval of the above plan pursuant to paragraph 67, Respondent must implement the plan in accordance with the approved schedules, milestones, and final compliance dates.

## VI. DOCUMENTATION AND SUBMISSIONS

55. Respondent must submit a status report to EPA within 30 days after the end of each calendar-year quarter (i.e., by January 31, April 30, July 31, and October 31), until this Order is terminated. The first status report will be due within 30 days after completion of the first full quarter after the effective date of this Order. Each status report must include: (a) a description of the actions that have been taken toward achieving compliance with this Order during the previous quarter; (b) a summary of all effluent violations that occurred during the previous quarter; and (c) an assessment of whether compliance plan milestone dates due during the quarter as set for in the Respondent's approved plans prepared in accordance with paragraph 54 were met, and, if not, the dates when the milestones will be met and the steps the Respondent is taking to ensure it completes the milestones. After Respondent has completed actions and construction, if necessary, in Respondent's approved plans prepared in accordance with paragraph 54 in order to achieve compliance with Respondent's effluent limits for mercury, pH and/or chlorine in its NPDES Permit, the status reports should also include the following: (a) with regard to actions taken to address effluent violations, an assessment of the effectiveness of such actions in preventing effluent violations; (b) a summary of all effluent violations that occurred during the previous quarter; and (c) an analysis of the cause of each such effluent violation.

56. All reports, notifications, documentation, submissions, and other correspondence required to be submitted by this Order must be submitted to EPA electronically, to the extent possible. If electronic submittal is not possible, the submissions must be made by certified mail (return

7

Republic Steel Lorain Plant

receipt requested). Electronic submissions must be sent to the following addresses: r5weca@epa.gov, maraldo.dean@epa.gov, and cahn.jeff@epa.gov, with a courtesy copy to brianne.workman@epa.ohio.gov. The subject line of all email correspondence must include the facility name, NPDES ID #OH0001562, and the subject of the deliverable. All electronically-submitted materials must be in final and searchable format, such as Portable Document Format (PDF) with Optical Character Recognition (OCR) applied. Any information containing confidential business information must be submitted and asserted as set forth at 40 C.F.R. Part 2 Subpart B and must be submitted by email to maraldo.dean@epa.gov and cahn.jeff@epa.gov or by mail (see below) but not to the r5weca@epa.gov and brianne.workman@epa.ohio.gov addresses. Mailed submissions must be sent to the following addresses:

> Attn: Dean Maraldo, EPA Case Manager
> Water Enforcement and Compliance Assurance Branch (ECW-15J)
> U.S. Environmental Protection Agency, Region 5
> 77 West Jackson Boulevard
> Chicago, Illinois  60604-3590

> Attn: Jeffrey A. Cahn
> Office of Regional Counsel (C-14J)
> U.S. Environmental Protection Agency, Region 5
> 77 West Jackson Boulevard
> Chicago, Illinois  60604-3590

> Courtesy copy to:
> Attn: Brianne Workman
> Ohio EPA – Northeast District Office
> 2110 East Aurora Road
> Twinsburg, Ohio 44087

57. EPA may require additional status reports, or fewer status reports, for the purpose of documenting the progress of the Work performed pursuant to this Order or compliance with the Permit requirements. If EPA requires additional status reports, then EPA will provide Respondent with at least 15 days' time from the date of EPA's request to submit the reports.

58. All reports, notifications, documentation, and submissions required by this Order must be signed by a duly authorized representative of Respondent as specified by 40 C.F.R. § 122.22(b) and (d) and must include the following statement:

> "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information

8

Republic Steel Lorain Plant

submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

59. Respondent may not withhold information based on a claim that it is confidential. However, pursuant to 40 C.F.R. Part 2, Subpart B, Respondent may assert a claim of business confidentiality regarding any portion of the information submitted in response to this Order. The manner of asserting such claims is specified in 40 C.F.R. § 2.203(b). Certain information related to effluent data (as defined in 40 C.F.R. § 2.302(a)(2)) and NPDES permit applications may not be entitled to confidential treatment. 40 C.F.R. § 122.7. Information subject to a business confidentiality claim is available to the public only to the extent, and by means of the procedures, set forth in 40 C.F.R. Part 2, Subpart B. If Respondent does not assert a claim of business confidentiality when it submits the information, EPA may make the information available to the public without further notice. 40 C.F.R. § 2.203(c).

60. If Respondent finds at any time after submitting information that any portion of that information is false or incorrect, the Respondent must notify EPA immediately. Knowingly submitting false information to EPA may subject Respondent to criminal prosecution under Section 309(c) of the CWA, 33 U.S.C. § 1319(c), as well as 18 U.S.C. § 1001 and 1341.

61. Submissions required by this Order will be deemed submitted on the date they are sent electronically or on the date postmarked if sent by U.S. mail.

62. After review of the submissions required pursuant to paragraphs 54, 55, 57, and 83 of this Order, EPA may approve or disapprove the submissions, in whole or in part. EPA shall approve the submissions or any portion so long as the submissions fulfill the requirements under this Order.

63. If EPA disapproves the submission(s), EPA will notify Respondent in writing, which may include notice by email, and EPA may require Respondent to supplement or modify its submission(s). Within 30 days after receipt of written notice of EPA's disapproval, Respondent must submit a corrected submission to EPA for approval. If Respondent's modified submission is disapproved in whole or in part by EPA, then EPA may require Respondent to correct the deficiencies or EPA may determine that the submission fails to meet the requirements of this Order.

64. Respondent may object in writing to the notice of disapproval within 10 days of receiving the notice, and the parties will have 30 days from EPA's receipt of Respondent's objection to reach an agreement. If the parties cannot reach an agreement, EPA will give Respondent a written decision on the objection, which may require Respondent to correct, modify, or

9

Republic Steel Lorain Plant

supplement its submission(s). If Respondent fails to undertake these corrections as required by EPA, EPA may determine that the submissions fail to meet the requirements of this Order.

65. Notwithstanding the receipt of a notice of disapproval pursuant to paragraph 63, above, Respondent must proceed to take all actions and provide all submissions required under this Order, including any actions required under any non-deficient portion(s) of its submission, if such action can be undertaken independent of the deficient portion of Respondent's submission.

66. Absent an extension of time granted in writing by EPA, EPA may determine that late submissions fail to meet the requirements of this Order.

67. Upon EPA approval, submissions by Respondent are incorporated and enforceable as part of this Order. In case of inconsistency between any submission by Respondent and this document and its subsequent modifications, this document and its subsequent modifications shall control.

68. Subject to the applicable rules of evidence, EPA may use any information submitted in response to this Order in support of an administrative, civil, or criminal action against Respondent.

69. The information required to be submitted pursuant to this Order is not subject to the approval requirements of the Paperwork Reduction Act of 1995, 44 U.S.C. § 3501 *et seq*.

## VII.  <u>DESIGNATED PROJECT COORDINATORS</u>

70. The Parties have designated their respective Project Coordinators as follows:

    a.   For EPA:        Dean Maraldo
                                    EPA Case Manager
                                    Water Enforcement and Compliance Assurance Branch (ECW-15J)
                                    U.S. Environmental Protection Agency, Region 5
                                    77 West Jackson Boulevard
                                    Chicago, Illinois  60604-3590
                                    maraldo.dean@epa.gov

    b.   For Respondent:   James Hardy
                                      VP – Engineering and Technology
                                      Republic Steel
                                      2633 8th Street N.E.
                                      Canton, Ohio 44704
                                      jhardy@republicsteel.com

Republic Steel Lorain Plant

71. The Respondent Project Coordinator shall oversee implementation of this Consent Order.

72. The Respondent may change the Project Coordinator by giving EPA written notice.

## VIII. **GENERAL PROVISIONS**

73. Respondent has had the opportunity to confer with and submit information to EPA concerning the validity and provisions of this Order.

74. The terms of this Order are binding on Respondent and its assignees and successors. Respondent must give notice of this Order to all successors in interest prior to transferring ownership, and must simultaneously verify to EPA, at the addresses specified in paragraph 56, that Respondent has given the notice.

75. The undersigned signatory for each party has the authority to bind each respective party to the terms and conditions of this Order.

76. Failure to comply with this Order may subject Respondent to penalties up to $56,460 per day for each violation (or as penalty levels may be later adjusted at 40 C.F.R. Part 19) pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and 40 C.F.R. Part 19.

77. This Order does not affect Respondent's responsibility to comply with the CWA, its Permit(s), and any other local, state, and federal laws, regulations, or permits.

78. This Order does not restrict EPA's authority to enforce the Permit or any section of the CWA or its implementing regulations.

79. EPA reserves all rights and remedies, legal and equitable, available to address any violation cited in this Order and any other violation of the CWA or of this Order. Neither issuance of this Order by EPA nor compliance with its terms precludes further enforcement action pursuant to Section 309 of the CWA, 33 U.S.C. § 1319, for the violations cited in this Order, for any other violations of the CWA or of this Order committed by Respondent.

80. The CWA includes provisions for administrative penalties, for civil injunctive relief and penalties, and for criminal penalties for violations of the CWA. Specifically, EPA may:

(a) assess civil administrative penalties under 33 U.S.C. § 1319(g) and 40 C.F.R. Part 19 of up to $22,584 per day of violation for violations of the CWA that occurred after November 2, 2015 and for which penalties are assessed on or after December 23, 2020, for up to a total of $282,293, or other amounts as penalty levels may be later adjusted at 40 C.F.R. Part 19;

(b) seek civil injunctive relief and penalties for violations of the CWA under 33 U.S.C. § 1319(b) and civil judicial penalties for violations of this Order under 33 U.S.C.

11

Republic Steel Lorain Plant

§ 1319(d). In accordance with 40 C.F.R. Part 19, EPA may seek civil judicial penalties of up to $56,460 per day of violation for violations that occurred after November 2, 2015 and for which penalties are assessed on or after December 23, 2020, or as penalty levels may be later adjusted at 40 C.F.R. Part 19; and

(c) seek criminal penalties, including fines and imprisonment, for negligent or knowing violations of the CWA under 33 U.S.C. § 1319(c).

## IX.  EFFECTIVE DATE

81. This Order shall become effective upon signature by EPA below and will remain in effect until EPA has notified Respondent of termination of the Order pursuant to paragraphs 82 or 84.

## X.  FINAL REPORT AND TERMINATION OF THIS ORDER

82. EPA may terminate this Order at any time by written notice to Respondent.

83. Absent the notice described in paragraph 82 and within 30 days after Respondent concludes that it has achieved compliance with all requirements of this Order, Respondent must submit to the EPA Case Manager a written final report and certification of completion describing all actions taken to comply with all requirements of this Order. Respondent must follow the procedures set forth at Section VI of this Order.

84. After receipt and review of Respondent's final report and certification of completion submitted pursuant to paragraph 83, EPA will notify Respondent whether it has satisfied all requirements of this Order under the procedures set forth at Section VI of this Order. If EPA concludes that Respondent has failed to satisfy the requirements of this Order, EPA may require further actions as set forth under this Order or it may pursue administrative or civil judicial actions.

12

Republic Steel Lorain Plant

IT IS SO AGREED AND ORDERED:

**FOR RESPONDENT, REPUBLIC STEEL:**

_____          _June 3ʳᵈ, 2021_
Signature                                              Date

_JOHN R. WILKINSON_
Name

_EVP - Operation_
Title

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

MICHAEL HARRIS    Digitally signed by MICHAEL HARRIS
                 Date: 2021.06.09 12:58:17 -05'00'
_____
Michael D. Harris
Division Director
Enforcement and Compliance Assurance Division
U.S. EPA Region 5

13

Republic Steel Lorain Plant

## ATTACHMENT A

Effluent Limit Exceedances Report
OH0001562: REPUBLIC STEEL LORAIN PLANT, LORAIN, OH 44055-1803
Monitoring Period Date Range: 05/01/2016 to 02/28/2021

Exceedance Details

| Monitoring Period Date | Outfall | Parameter Description | Limit Type | DMR Value | Limit Value | Limit Value Qualifier | Limit Value Unit |
|---|---|---|---|---|---|---|---|
| 6/30/2016 | 5 | Oil and grease (soxhlet extr.) tot. | DAILY MX | 21 | 10 | <= | mg/L |
| 7/31/2016 | 2 | Chlorine, total residual | MO AVG | 1.2 | 0.86 | <= | kg/d |
| 7/31/2016 | 2 | Chlorine, total residual | MO AVG | 0.24 | 0.014 | <= | mg/L |
| 7/31/2016 | 2 | Chlorine, total residual | DAILY MX | 0.24 | 0.024 | <= | mg/L |
| 7/31/2016 | 5 | Chlorine, total residual | DAILY MX | 0.18 | 0.027 | <= | mg/L |
| 7/31/2016 | 5 | Chlorine, total residual | DAILY MX | 4 | 0.89 | <= | kg/d |
| 7/31/2016 | 5 | Chlorine, total residual | MO AVG | 4 | 0.53 | <= | kg/d |
| 7/31/2016 | 5 | Chlorine, total residual | MO AVG | 0.18 | 0.016 | <= | mg/L |
| 8/31/2016 | 2 | Oil and grease (soxhlet extr.) tot. | DAILY MX | 12 | 10 | <= | mg/L |
| 8/31/2016 | 2 | Chlorine, total residual | MO AVG | 1.3 | 0.86 | <= | kg/d |
| 8/31/2016 | 2 | Chlorine, total residual | DAILY MX | 0.26 | 0.024 | <= | mg/L |
| 8/31/2016 | 2 | Chlorine, total residual | MO AVG | 0.26 | 0.014 | <= | mg/L |
| 8/31/2016 | 5 | Chlorine, total residual | DAILY MX | 0.14 | 0.027 | <= | mg/L |
| 8/31/2016 | 5 | Chlorine, total residual | DAILY MX | 3.1 | 0.89 | <= | kg/d |
| 8/31/2016 | 5 | Chlorine, total residual | MO AVG | 3.1 | 0.53 | <= | kg/d |
| 8/31/2016 | 5 | Chlorine, total residual | MO AVG | 0.14 | 0.016 | <= | mg/L |
| 9/30/2016 | 2 | Chlorine, total residual | MO AVG | 1.8 | 0.86 | <= | kg/d |
| 9/30/2016 | 2 | Chlorine, total residual | DAILY MX | 0.36 | 0.024 | <= | mg/L |
| 9/30/2016 | 2 | Chlorine, total residual | MO AVG | 0.36 | 0.014 | <= | mg/L |
| 9/30/2016 | 2 | Chlorine, total residual | DAILY MX | 1.8 | 1.47 | <= | kg/d |
| 12/31/2016 | 5 | Mercury, total low level | MO AVG | 5.4E-06 | 4.9E-06 | <= | mg/L |
| 3/31/2017 | 2 | pH | DAILY MX | 9.94 | 9 | <= | SU |
| 5/31/2017 | 5 | Oil and grease (soxhlet extr.) tot. | DAILY MX | 14 | 10 | <= | mg/L |
| 6/30/2017 | 5 | Oil and grease (soxhlet extr.) tot. | DAILY MX | 21 | 10 | <= | mg/L |
| 7/31/2017 | 2 | pH | DAILY MX | 9.99 | 9 | <= | SU |
| 7/31/2017 | 2 | Chlorine, total residual | MO AVG | 0.07 | 0.014 | <= | mg/L |
| 7/31/2017 | 2 | Chlorine, total residual | DAILY MX | 0.07 | 0.024 | <= | mg/L |
| 7/31/2017 | 5 | Chlorine, total residual | DAILY MX | 6.1 | 0.89 | <= | kg/d |
| 7/31/2017 | 5 | Chlorine, total residual | DAILY MX | 0.28 | 0.027 | <= | mg/L |
| 7/31/2017 | 5 | Chlorine, total residual | MO AVG | 6.1 | 0.53 | <= | kg/d |
| 7/31/2017 | 5 | Chlorine, total residual | MO AVG | 0.28 | 0.016 | <= | mg/L |
| 8/31/2017 | 2 | pH | DAILY MX | 9.54 | 9 | <= | SU |
| 10/31/2017 | 2 | Chlorine, total residual | MO AVG | 0.06 | 0.014 | <= | mg/L |
| 10/31/2017 | 2 | Chlorine, total residual | DAILY MX | 0.06 | 0.024 | <= | mg/L |
| 11/30/2017 | 2 | pH | DAILY MX | 9.52 | 9 | <= | SU |
| 12/31/2017 | 2 | pH | DAILY MX | 10.23 | 9 | <= | SU |
| 12/31/2017 | 5 | pH | DAILY MX | 9.01 | 9 | <= | SU |
| 2/28/2018 | 2 | pH | DAILY MX | 9.44 | 9 | <= | SU |
| 2/28/2018 | 5 | pH | DAILY MX | 9.22 | 9 | <= | SU |
| 3/31/2018 | 2 | pH | DAILY MX | 10.53 | 9 | <= | SU |
| 3/31/2018 | 5 | pH | DAILY MX | 9.21 | 9 | <= | SU |
| 4/30/2018 | 2 | pH | DAILY MX | 9.92 | 9 | <= | SU |
| 5/31/2018 | 2 | pH | DAILY MX | 9.9 | 9 | <= | SU |
| 6/30/2018 | 2 | pH | DAILY MX | 9.98 | 9 | <= | SU |
| 7/31/2018 | 2 | pH | DAILY MX | 10.11 | 9 | <= | SU |
| 8/31/2018 | 2 | pH | DAILY MX | 9.31 | 9 | <= | SU |
| 8/31/2018 | 2 | Chlorine, total residual | DAILY MX | 0.19 | 0.024 | <= | mg/L |
| 8/31/2018 | 2 | Chlorine, total residual | MO AVG | 0.19 | 0.014 | <= | mg/L |
| 8/31/2018 | 2 | Chlorine, total residual | MO AVG | 0.93 | 0.86 | <= | kg/d |
| 9/30/2018 | 2 | pH | DAILY MX | 9.55 | 9 | <= | SU |
| 11/30/2018 | 2 | pH | DAILY MX | 9.19 | 9 | <= | SU |
| 12/31/2018 | 2 | pH | DAILY MX | 9.63 | 9 | <= | SU |
| 1/31/2019 | 2 | pH | DAILY MX | 9.39 | 9 | <= | SU |
| 2/28/2019 | 2 | pH | DAILY MX | 9.6 | 9 | <= | SU |
| 2/28/2019 | 5 | Mercury, total low level | MO AVG | 0.00026 | 0.00016 | <= | kg/d |

14

Republic Steel Lorain Plant

| Monitoring Period Date | Outfall | Parameter Description | Limit Type | DMR Value | Limit Value | Limit Value Qualifier | Limit Value Unit |
|---|---|---|---|---|---|---|---|
| 2/28/2019 | 5 | Mercury, total low level | MO AVG | 1.2E-05 | 4.9E-06 | <= | mg/L |
| 3/31/2019 | 2 | pH | DAILY MX | 9.45 | 9 | <= | SU |
| 4/30/2019 | 2 | pH | DAILY MX | 9.24 | 9 | <= | SU |
| 5/31/2019 | 2 | pH | DAILY MX | 9.52 | 9 | <= | SU |
| 5/31/2019 | 5 | Mercury, total low level | MO AVG | 7E-06 | 4.9E-06 | <= | mg/L |
| 6/30/2019 | 2 | pH | DAILY MX | 9.44 | 9 | <= | SU |
| 6/30/2019 | 5 | Oil and grease (soxhlet extr.) tot. | DAILY MX | 120 | 10 | <= | mg/L |
| 7/31/2019 | 2 | pH | DAILY MX | 10.09 | 9 | <= | SU |
| 7/31/2019 | 2 | Chlorine, total residual | DAILY MX | 0.13 | 0.024 | <= | mg/L |
| 7/31/2019 | 2 | Chlorine, total residual | MO AVG | 0.13 | 0.014 | <= | mg/L |
| 7/31/2019 | 5 | Chlorine, total residual | DAILY MX | 1.3 | 0.89 | <= | kg/d |
| 7/31/2019 | 5 | Chlorine, total residual | DAILY MX | 0.06 | 0.027 | <= | mg/L |
| 7/31/2019 | 5 | Chlorine, total residual | MO AVG | 1.3 | 0.53 | <= | kg/d |
| 7/31/2019 | 5 | Chlorine, total residual | MO AVG | 0.06 | 0.016 | <= | mg/L |
| 8/31/2019 | 2 | pH | DAILY MX | 9.66 | 9 | <= | SU |
| 8/31/2019 | 2 | Mercury, total low level | MO AVG | 3.5E-05 | 1.73E-05 | <= | mg/L |
| 8/31/2019 | 5 | Chlorine, total residual | MO AVG | 0.13 | 0.016 | <= | mg/L |
| 8/31/2019 | 5 | Chlorine, total residual | MO AVG | 2.9 | 0.53 | <= | kg/d |
| 8/31/2019 | 5 | Chlorine, total residual | DAILY MX | 2.9 | 0.89 | <= | kg/d |
| 8/31/2019 | 5 | Chlorine, total residual | DAILY MX | 0.13 | 0.027 | <= | mg/L |
| 9/30/2019 | 2 | pH | DAILY MX | 9.82 | 9 | <= | SU |
| 9/30/2019 | 2 | Chlorine, total residual | MO AVG | 1.1 | 0.86 | <= | kg/d |
| 9/30/2019 | 2 | Chlorine, total residual | MO AVG | 0.22 | 0.014 | <= | mg/L |
| 9/30/2019 | 2 | Chlorine, total residual | DAILY MX | 0.22 | 0.024 | <= | mg/L |
| 9/30/2019 | 5 | Chlorine, total residual | DAILY MX | 1.8 | 0.89 | <= | kg/d |
| 9/30/2019 | 5 | Chlorine, total residual | MO AVG | 0.08 | 0.016 | <= | mg/L |
| 9/30/2019 | 5 | Chlorine, total residual | MO AVG | 1.8 | 0.53 | <= | kg/d |
| 9/30/2019 | 5 | Chlorine, total residual | DAILY MX | 0.08 | 0.027 | <= | mg/L |
| 10/31/2019 | 2 | pH | DAILY MX | 9.72 | 9 | <= | SU |
| 2/29/2020 | 2 | pH | DAILY MX | 9.63 | 9 | <= | SU |
| 3/31/2020 | 2 | pH | DAILY MX | 9.09 | 9 | <= | SU |
| 4/30/2020 | 2 | pH | DAILY MX | 9.56 | 9 | <= | SU |
| 4/30/2020 | 5 | pH | DAILY MX | 9.43 | 9 | <= | SU |
| 5/31/2020 | 2 | pH | DAILY MX | 9.97 | 9 | <= | SU |
| 5/31/2020 | 5 | Oil and grease (soxhlet extr.) tot. | DAILY MX | 13 | 10 | <= | mg/L |
| 6/30/2020 | 2 | pH | DAILY MX | 10.68 | 9 | <= | SU |
| 7/31/2020 | 2 | pH | DAILY MX | 10.72 | 9 | <= | SU |
| 7/31/2020 | 2 | Chlorine, total residual | DAILY MX | 0.08 | 0.024 | <= | mg/L |
| 7/31/2020 | 2 | Chlorine, total residual | MO AVG | 0.08 | 0.014 | <= | mg/L |
| 8/31/2020 | 2 | pH | DAILY MX | 10.77 | 9 | <= | SU |
| 9/30/2020 | 2 | pH | DAILY MX | 10.99 | 9 | <= | SU |
| 9/30/2020 | 5 | Chlorine, total residual | MO AVG | 0.15 | 0.016 | <= | mg/L |
| 9/30/2020 | 5 | Chlorine, total residual | DAILY MX | 0.15 | 0.027 | <= | mg/L |
| 10/31/2020 | 2 | pH | DAILY MX | 9.86 | 9 | <= | SU |
| 10/31/2020 | 2 | Chlorine, total residual | DAILY MX | 0.06 | 0.024 | <= | mg/L |
| 10/31/2020 | 2 | Chlorine, total residual | MO AVG | 0.06 | 0.014 | <= | mg/L |
| 11/30/2020 | 2 | pH | DAILY MX | 11.08 | 9 | <= | SU |
| 11/30/2020 | 5 | pH | DAILY MX | 9.36 | 9 | <= | SU |
| 12/31/2020 | 2 | pH | DAILY MX | 9.84 | 9 | <= | SU |
| 1/31/2021 | 2 | pH | DAILY MX | 10.41 | 9 | <= | SU |
| 1/31/2021 | 5 | pH | DAILY MX | 9.06 | 9 | <= | SU |
| 2/28/2021 | 2 | pH | DAILY MX | 10.62 | 9 | <= | SU |
| 2/28/2021 | 3 | Mercury, total low level | MO AVG | 1.7E-05 | 1.19E-05 | <= | mg/L |
| 2/28/2021 | 5 | pH | DAILY MX | 9.08 | 9 | <= | SU |

15

Republic Steel Lorain Plant

# Exhibit 3

Lorain Facility
2022 AOC

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 5

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Republic Steel, ) | **Administrative Order on Consent** |
| ) | **Under Section 309(a) of the Clean Water** |
| Respondent. ) | **Act, 33 U.S.C. § 1319(a)** |
| ) | |
| ) | |

## I.  INTRODUCTION

1. The U.S. Environmental Protection Agency ("EPA") makes the findings of fact set forth below (Section IV) and is issuing this Administrative Order on Consent ("Order on Consent" or "Order") to Republic Steel, owner of the Republic Steel Lorain Plant, ("Respondent") under the authority of Section 309(a) of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1319(a). The Administrator of EPA has delegated the authority to issue such orders to the Regional Administrator of EPA Region 5, who has redelegated this authority to the Director of the Enforcement and Compliance Assurance Division, EPA, Region 5.

2. This Order is mutually entered into by EPA and Respondent.

3. At all times relevant to this Order, Respondent has owned and operated the Republic Steel Lorain Plant, located at 1807 E. 28th Street, Lorain, Ohio (the "Facility").

4. EPA alleges that Respondent violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging a pollutant or pollutants into the navigable waters from a point source without a permit to do so.

5. By entering into this Order, Respondent: (1) consents to EPA's authority to issue this Order; (2) neither admits nor denies the factual allegations as set forth in this Order; (3) agrees to undertake all actions required by the terms and conditions of this Order; and (4) agrees not to contest the authority of EPA to issue this Order or the validity of any terms or conditions in this Order.

6. For the purposes of this Order only, Respondent waives any and all remedies, claims for relief, and otherwise available rights to judicial or administrative review that Respondent may have with respect to any issue of fact or law set forth in this Order on Consent, including, but not limited to, any right of judicial review under Chapter 7 of the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

Republic Steel Lorain Plant

## II. STATUTORY AUTHORITY

7. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person except, *inter alia*, in compliance with an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

8. Section 402 of the CWA, 33 U.S.C. § 1342, authorizes states to request approval from EPA to administer their own permit programs for discharges into navigable waters within their jurisdictions.

9. Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the State of Ohio requested approval from EPA to administer its own permit program for discharges into navigable waters within Ohio, and such approval was granted by EPA on March 11, 1974, 39 Fed. Reg. 26,061 (July 16, 1974). Therefore, pursuant to the State's permit program, the Ohio EPA has issued Ohio EPA NPDES permits. Violation of an NPDES permit is a violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

10. Section 309(a)(3) of the CWA, 33 U.S.C. § 1319(a)(3), provides that whenever EPA finds that any person is in violation of requirements of, *inter alia*, Sections 301, 308, or 402 of the CWA, 33 U.S.C. § 1311, 1318, 1342, or is in violation of any condition or limitation that implements those sections in an NPDES permit, EPA shall issue an order requiring such person to comply with such requirements, conditions, or limitations. Section 309(a)(5) of the CWA, 33 U.S.C. § 1319(a)(5), requires that any such order shall specify a time for compliance that EPA determines to be reasonable taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements.

## III. DEFINITIONS

11. All terms used, but not defined, in this Order have the meanings provided to them in the CWA, 33 U.S.C. § 1251 *et seq.*, and the effective EPA regulations promulgated under the CWA.

12. "Act" or "CWA" means the Clean Water Act, 33 U.S.C. § 1251 *et seq.*

13. "Day" or "days" means a calendar day or calendar days unless expressly stated to be a business day. When computing any period of time under this Order, should the last day fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

14. "Discharge of a pollutant," as defined in Section 502(12) of the CWA, means *inter alia*, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

15. "Effective Date" has the definition provided in Section VIII of this Order.

2

16. "EPA" means the United States Environmental Protection Agency.

17. "Facility" means the Republic Steel Lorain Plant located at 1807 E. 28th Street, Lorain, Ohio.

18. "Navigable Waters," as defined in Section 502(7) of the CWA, means "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

19. "Ohio EPA" means the Ohio Environmental Protection Agency and any successor departments, agencies, or instrumentalities of the State.

20. "Order on Consent" and "Order" means this document, all attachments hereto, and all subsequent modifications thereto, including incorporated submissions from Respondent, as described in Paragraph 58.

21. "Outfall" means a type of "point source," as that term is defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14), that serves as a discharge point from the Facility.

22. "Paragraph" means a portion of this Order identified by an Arabic numeral.

23. "Parties" means the EPA and Respondent/Facility.

24. "NPDES Permit" and "Permit" mean the permit issued in accordance with the National Pollutant Discharge Elimination System (NPDES) pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. In this Order, these terms mean NPDES Permit No. OH0001562, issued by the State of Ohio to Respondent for the Republic Steel Lorain Plant with the effective date of July 24, 2013 (with March 1, 2016, modification), and the expiration date of December 31, 2017. Respondent submitted an application for permit renewal to Ohio EPA on June 29, 2017. The July 24, 2013, Permit is administratively continued. For purposes of Sections IV through VIII of this Order, "Permit" also means any subsequent NPDES permit issued by the State of Ohio to Respondent for the Republic Steel Lorain Plant, until such time as this Order is terminated.

25. "Person," as defined in Section 502(5) of the CWA, means an "individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

26. "Point Source," as defined in Section 502(14) of the CWA, means "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

27. "Pollutant," as defined in Section 502(6) of the CWA, means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological

materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

28. "Respondent" means Republic Steel, the owner of the Republic Steel Lorain Plant, in Lorain, Ohio.

29. "State" means the State of Ohio.

30. "Unidentified Outfall" means the discharging constructed outfall observed by EPA inspectors on April 20, 2022, just east of Outfall 003. The Unidentified Outfall discharges to the Black River and is not identified or authorized under the Facility's current NPDES Permit.

31. "Work" means any and all activities Respondent is required to undertake and accomplish to achieve compliance under this Order.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

32. Respondent is a corporation, so it is a "person," as defined in Section 502(5) of the CWA, 33 U.S.C. § 1362(5), and 40 C.F.R. § 122.2.

33. At all times relevant to this Order, Respondent owned and operated the Republic Steel Lorain Plant, an integrated steel mill facility, located in Lorain, Ohio.

34. On April 20, 2022, EPA conducted an inspection at the Facility to assess the Respondent's compliance with its Permit. EPA inspectors observed water discharging from an unidentified, but constructed, outfall ("Unidentified Outfall"), located on a bluff along the Black River (latitude 41.451828; longitude -82.148533). EPA inspectors observed a continuous discharge from the Unidentified Outfall flowing down a slope and into the Black River. The discharge resulted in light colored deposits and staining along the path of the discharge to the bank of the Black River. Facility representatives stated that the observed flow was the heaviest observed and indicated that the discharge may be associated with the Facility Blast Furnace Basement. EPA inspectors estimated a discharge flow rate of 8.5 gallons per minute (approximately 12,200 gallons per day) from the Unidentified Outfall. EPA inspectors sampled the discharge directly from the Unidentified Outfall and measured a pH of 12.20 S.U., and a total residual chlorine concentration of 0.13 milligrams per liter. EPA's observations are described in more detail in the EPA Region 5, *NPDES Compliance Evaluation Inspection Report* for the Facility, dated April 26, 2022, which has been provided to the Respondent.

35. On the day of the EPA inspection, the Unidentified Outfall discharged high pH and chlorinated liquids into the Black River.

36. The Unidentified Outfall at the Republic Steel Lorain Plant is a "point source," as defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

4

37. Chlorine and pH are "pollutants," as defined in Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

38. The Black River is a "navigable water" within the meaning of Section 502 of the CWA, 33 U.S.C. § 1362, and "waters of the United States" within the meaning of 40 C.F.R. § 122.2 (1993).

39. Ohio EPA included the Black River in its 2022 CWA Section 303(d) impaired waters list. Impairments include aquatic life use - warmwater habitat (nutrients and specific conductivity), human health- fish consumption (PCBs in fish tissue), and recreation-primary contact (*Escherichia Coli* ["*E. coli*"]).

40. On the day of the EPA inspection, the Unidentified Outfall at the Facility acted as point source of "discharge(s)" of "pollutant(s)" with its final wastewater discharge to the Black River.

41. Because Respondent owns or operates a Facility with an outfall that acted as a point source for the discharge of pollutants to navigable waters, Respondent and the Facility have been subject to the CWA at all times relevant to this Order. Thus, any such discharge has been and is subject to the CWA.

42. At all times relevant to this Order, Respondent had not applied for and was not issued an NPDES Permit under Section 402 of the CWA, 33 U.S.C. § 1342, authorizing the discharge of pollutants from the Unidentified Outfall described above.

43. Respondent is a person who discharged pollutants from a point source into navigable waters, without a permit authorizing such discharges under Section 402 of the CWA, 33 U.S.C. § 1342. Accordingly, each instance in which Respondent discharged pollutants to navigable waters without a permit authorizing such discharges, is a violation of Section 301 of the CWA, 33 U.S.C. § 1311.

## V. <u>ORDER ON CONSENT</u>

44. Based on the foregoing findings and the authority vested in the undersigned Director, Enforcement and Compliance Assurance Division, it is hereby ordered and agreed to in accordance with Section 309(a) of the CWA, 33 U.S.C. § 1319(a), that Respondent comply with the following actions:

A. Within 45 days after the Effective Date of this Order and in accordance with the corrective action plan included in Attachment A of this Order, Respondent must eliminate all known unauthorized discharges, including the discharges described in Paragraph 34 of this Order.

5

B. Within 60 days after the Effective Date of this Order, Respondent shall submit a report to EPA documenting actions taken to eliminate the unauthorized discharges. The report shall include:

    a. An estimate of how much water was discharged (number of days and gallons per day) from the Unidentified Outfall prior to implementing Work;

    b. Associated costs for all Work;

    c. Photographs documenting measures implemented; and

    d. A signed certification statement that all known unauthorized discharges, including the discharges described in Paragraph 34 of this Order, were eliminated (or otherwise authorized pursuant to an NPDES permit) per the corrective action plan and within 45 days after the Effective Date of this Order.

C. Monitoring of the Unidentified Outfall.

    a. Initial Monitoring: Within 7 days after the Effective Date, Respondent shall monitor and collect representative samples from the Unidentified Outfall to assess the makeup of the wastewater and create a baseline to assess progress towards eliminating the discharge. Respondent shall not conduct such sampling within 72 hours following a rainfall event exceeding one-half inch of precipitation as measured by on-site monitoring equipment or nearest local weather station if on-site weather monitoring is not available. For all sampling required under this Order, a laboratory certified by Ohio EPA's laboratory certification program must conduct the analyses of samples requiring laboratory analysis. Analyses of dissolved oxygen, pH, total residual chlorine, and temperature do not need to be completed by a certified laboratory but shall be completed by equipment that is verified for accuracy before use. Sample preservation and test procedures for all analyses must conform to 40 C.F.R Part 136. Respondent shall report all laboratory analytical results and measurements to EPA pursuant to this Order within 30 days after collection of the sample. The Initial Monitoring Report shall include a table summarizing all results of the Initial Monitoring Event. Initial monitoring of the Unidentified Outfall shall include the following parameters, with samples collected as grab samples, unless indicated otherwise: water temperature (F); dissolved oxygen (mg/l); pH (S.U.); specific conductance (in μmhos/cm); *E. coli* (#/100 ml); total residual chlorine (mg/l); total suspended solids (mg/l); total dissolved solids (mg/l); alkalinity (mg/l as $CaCO_3$; 24-hour composite); cyanide, total (EPA Method 335.4, mg/l); oil and grease (mg/l), total; nitrogen, ammonia (mg/l, 24-hour composite); copper, iron, lead, zinc (all in total recoverable form and in mg/l, 24-hour composite); total mercury (EPA Method 1631, low level in ng/l); chronic toxicity, Ceriodaphnia dubia and Pimephales promelas (TUc), following procedures outlined in the current NPDES permit for the Facility (Part II.L.), 24-hour composite; and outfall flow in gallons per day.

    b. Monitoring During Implementation of Corrective Action Plan: After completion of the Initial Monitoring program pursuant to the subparagraph above, Respondent shall

6

monitor and sample the Unidentified Outfall in accordance with Table 1, below, until the discharges from the Unidentified Outfall are eliminated (or otherwise authorized pursuant to an NPDES permit).

Table 1.  Monitoring Requirements During Implementation of Corrective Action Plan

| Parameter | Measuring Frequency | Sampling Type |
|---|---|---|
| E. coli (#/100 ml) | 1/Week | Grab |
| Water Temperature - F | 1/Week | Grab |
| Dissolved Oxygen – mg/l | 1/Week | Grab |
| pH - S.U. | 1/Week | Grab |
| Specific conductance (µmhos/cm) | 1/Week | Grab |
| Oil and Grease, Total - mg/l | 1/Week | Grab |
| Flow Rate – Gallons per day | 2/Week* | 24hr Total Estimate |
| Chlorine, Total Residual - mg/l | 1/Week | Grab |

\* One dry weather (at least 72 hours following a rainfall event exceeding one-half inch of precipitation) and one wet-weather (within four hours of a 0.5 inch or greater rain event) shall be collected per week.  If no one-half inch or greater rain events occur, sample on two different dry weather days.

Sample preservation and test procedures for the analysis must conform to 40 C.F.R Part 136.  Respondent must report all laboratory analytical results and measurements for the month to EPA by the 30th day of the following month (*e.g.*, results of all sampling conducted in the month of June must be submitted to EPA by July 30th). The monthly monitoring reports shall include a table summarizing all results. The first monitoring report will be due within 30 days after completion of the first full month after the Effective Date of this Order (the first monthly report will include all sampling results collected since the Initial Monitoring event and may include several weeks of sampling results).

## VI.  DOCUMENTATION AND SUBMISSIONS

45. All reports, notifications, documentation, submissions, and other correspondence required to be submitted by this Order must be submitted to EPA electronically, to the extent possible. If electronic submittal is not possible, the submissions must be made by certified mail (return receipt requested). Electronic submissions must be sent to the following addresses: r5weca@epa.gov, maraldo.dean@epa.gov, and cahn.jeff@epa.gov, with a courtesy copy to brianne.workman@epa.ohio.gov. The subject line of all email correspondence must include the Facility name, NPDES ID #OH0001562, and the subject of the deliverable. All electronically-submitted materials must be in final and searchable format, such as Portable Document Format (PDF) with Optical Character Recognition (OCR) applied. Any information containing confidential business information must be submitted and asserted as set forth at 40 C.F.R. Part 2 Subpart B and must be submitted by email to maraldo.dean@epa.gov and cahn.jeff@epa.gov or by mail (see below) but not to the r5weca@epa.gov and brianne.workman@epa.ohio.gov addresses. Mailed submissions must be sent to the following addresses:

Attn: Dean Maraldo, EPA Case Manager
Water Enforcement and Compliance Assurance Branch (ECW-15J)
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard
Chicago, Illinois  60604-3590

Attn: Jeffrey A. Cahn
Office of Regional Counsel (C-14J)
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard
Chicago, Illinois  60604-3590

Courtesy copy to:
Attn: Brianne Workman
Ohio EPA – Northeast District Office
2110 East Aurora Road
Twinsburg, Ohio 44087

46. Within 10 days after the Effective Date of this Order, Respondent must designate a project coordinator and provide EPA's Case Manager (above) with the project coordinator's name, address, phone number, and email address.

47. In the event of a change to the project coordinator, Respondent must provide notification in writing, pursuant to Paragraphs 45 and 46 above, within 30 days after the change.

48. EPA may require additional status reports, or fewer status reports, for the purpose of documenting the progress of the Work performed pursuant to this Order or compliance with the Permit requirements. Should EPA require additional status reports, EPA will provide Respondent with at least 15 days from the date of EPA's request to submit the reports.

49. All reports, notifications, documentation, and submissions required by this Order must be signed by a duly authorized representative of Respondent as specified by 40 C.F.R. § 122.22(b) and (d) and must include the following statement:

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

8

50. Respondent may not withhold information based on a claim that it is confidential. However, pursuant to 40 C.F.R. Part 2, Subpart B, Respondent may assert a claim of business confidentiality regarding any portion of the information submitted in response to this Order. The manner of asserting such claims is specified in 40 C.F.R. § 2.203(b). Certain information related to effluent data (as defined in 40 C.F.R. § 2.302(a)(2)) and NPDES permit applications may not be entitled to confidential treatment. 40 C.F.R. § 122.7. Information subject to a business confidentiality claim is available to the public only to the extent, and by means of the procedures, set forth in 40 C.F.R. Part 2, Subpart B. If Respondent does not assert a claim of business confidentiality when it submits the information, EPA may make the information available to the public without further notice. 40 C.F.R. § 2.203(c).

51. If Respondent finds at any time after submitting information that any portion of that information is false or incorrect, the signatory must notify EPA immediately. Knowingly submitting false information to EPA may subject Respondent to criminal prosecution under Section 309(c) of the CWA, 33 U.S.C. § 1319(c), as well as 18 U.S.C. §§ 1001 and 1341.

52. Submissions required by this Order must be deemed submitted on the date they are sent electronically or on the date postmarked if sent by U.S. mail.

53. After review of the submissions required pursuant to Paragraphs 44, 48, and 71 of this Order, EPA may approve or disapprove the submissions, in whole or in part. EPA shall approve the submissions or any portion so long as the submissions fulfill the requirements under this Order.

54. If EPA disapproves the submission(s), EPA will notify Respondent in writing, which may include notice by email, and EPA may require Respondent to supplement or modify its submission(s). Within 30 days following receipt of written notice of EPA's disapproval, Respondent must submit a corrected submission to EPA for approval. In the event that Respondent's modified submission is disapproved in whole or in part by EPA, EPA may require Respondent to correct the deficiencies or EPA may determine that the submission fails to meet the requirements of this Order.

55. Respondent may object in writing to the notice of disapproval within 10 days of receiving the notice, and the parties will have 30 days from EPA's receipt of Respondent's objection to reach an agreement. If the parties cannot reach an agreement, EPA will give Respondent a written decision on the objection, which may require Respondent to correct, modify, or supplement its submission(s). If Respondent fails to undertake these corrections as required by EPA, EPA may determine that the submissions fail to meet the requirements of this Order.

56. Notwithstanding the receipt of a notice of disapproval pursuant to Paragraph 54, above, Respondent must proceed to take all actions and provide all submissions required under this Order, including any actions required under any non-deficient portion(s) of its submission, if such action can be undertaken independent of the deficient portion of Respondent's submission.

57. Absent an extension of time granted in writing by EPA, EPA may determine that late submissions fail to meet the requirements of this Order.

58. Upon EPA approval, submissions by Respondent are incorporated and enforceable as part of this Order. In case of inconsistency between any submission by Respondent and this document and its subsequent modifications, this document and its subsequent modifications shall control.

59. EPA may use any information submitted in response to this Order in support of an administrative, civil, or criminal action against Respondent.

60. Information collection under this Order is exempt from the Paperwork Reduction Act under 44 U.S.C. § 3518(c)(1)(B).

## VII. **GENERAL PROVISIONS**

61. Respondent has had the opportunity to confer with and submit information to EPA concerning the validity and provisions of this Order.

62. The terms of this Order are binding on Respondent and its assignees and successors. Respondent must give notice of this Order to any successors in interest prior to transferring ownership, and must simultaneously verify to EPA, at the address specified in Paragraph 45, that Respondent has given the notice.

63. The undersigned signatory for each party has the authority to bind each respective party to the terms and conditions of this Order.

64. Failure to comply with this Order may subject Respondent to penalties up to $59,973 per day for each violation (or as penalty levels may be later adjusted at 40 C.F.R. Part 19) pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and 40 C.F.R. Part 19.

65. This Order does not affect Respondent's responsibility to comply with the CWA, its Permit(s), and any other local, state, and federal laws, regulations, or permits.

66. This Order does not restrict EPA's authority to enforce the Permit or any section of the CWA or its implementing regulations.

67. EPA reserves all rights and remedies, legal and equitable, available to address any violation cited in this Order and any other violation of the CWA or of this Order. Neither issuance of this Order by EPA nor compliance with its terms precludes further enforcement action pursuant to Section 309 of the CWA, 33 U.S.C. § 1319, for the violations cited in this Order, for any other violations of the CWA or of this Order committed by Respondent.

68. For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal

10

Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2), performance of Work described in Paragraph 44 is restitution, remediation, or required to come into compliance with the law.

## VIII.  EFFECTIVE DATE

69. This Order shall become effective upon signature by EPA below and will remain in effect until EPA has notified Respondent of termination of the Order pursuant to Paragraphs 70 or 72.

## IX.  FINAL REPORT AND TERMINATION OF THIS ORDER

70. EPA may terminate this Order at any time by written notice to Respondent.

71. Absent the notice described in Paragraph 70 and within 30 days after Respondent concludes that it has achieved compliance with all requirements of this Order, Respondent must submit to the EPA Case Manager a written final report and certification of completion describing all actions taken to comply with all requirements of this Order. Respondent must follow the procedures set forth at Section VI of this Order.

72. After receipt and review of Respondent's final report and certification of completion submitted pursuant to Paragraph 71, EPA will notify Respondent whether it has satisfied all requirements of this Order under the procedures set forth at Section VI of this Order. If EPA concludes that Respondent has failed to satisfy the requirements of this Order, EPA may require further actions as set forth under this Order or pursue further legal actions.

Republic Steel Lorain Plant

IT IS SO AGREED AND ORDERED:

**FOR RESPONDENT, REPUBLIC STEEL:**

_____     June 6th 2022
Signature                                              Date

JOHN R WILKINSON
Name

EVP - Operation
Title

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

MICHAEL       Digitally signed by MICHAEL
HARRIS        HARRIS
              Date: 2022.06.07 11:48:37
              -05'00'
_____     _____
Michael D. Harris                                    Date
Division Director
Enforcement and Compliance Assurance Division
U.S. EPA Region 5

12

Republic Steel Lorain Plant

ATTACHMENT A

Corrective Action Plan

**Republic Steel- Lorain Facility**
**Action Plan to Address Discharge from Tunnel Previously Used to Run Electrical Cable**
**5/16/22**

On April 20, 2022, during an inspection of the Lorain Facility by the United States Environmental Protection Agency, flow was observed from a tunnel down a slope into the Black River as noted in the U.S. EPA Inspection Report. Based upon an internal investigation performed by Republic Steel, the tunnel is believed to be a historical tunnel at the Republic Steel Lorain Facility to run conduit to the docks and was not designed to be an outfall. In order to address the flow from the tunnel, Republic Steel will implement the following action plan to address the discharge:

1. Republic Steel is contracting with a third party vendor to seal the electrical tunnel with concrete to prevent any continued discharge to the Black River. Republic Steel will seal the tunnel with concrete with 45 days from execution of Administrative Order on Consent (AOC). A copy of the proposal from the concrete vendor is included as an attachment;

2. Republic Steel will scrape discolored soils in front of the tunnel using a front loader. Republic Steel will ensure that the soil removed will be properly disposed. Republic will perform this work within 45 days from the execution of AOC; and

3. Republic Steel personnel will continue to monitor the western portion of the Lorain facility to ensure that once the tunnel is sealed the redirected water is not discharged through an unauthorized discharge location.

13

Republic Steel Lorain Plant